Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (admission pending)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v. forthcoming*)
egrauman@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

MICHELLE FENDELANDER, RONDA LEE HAINES, MICHAEL HUGHES, JOHN MANSO, and JASMINE MCCORMICK, individually and on behalf of all others similarly situated,

        Plaintiffs,

        v.

THE WALT DISNEY COMPANY, a Delaware corporation,

        Defendant.

Case No. 5:22-cv-07533

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

PARTIES ............................................................................................................... 2

I.     PLAINTIFFS .................................................................................................. 2

II.    DEFENDANT ................................................................................................ 3

JURISDICTION AND VENUE ................................................................................ 4

DIVISIONAL ASSIGNMENT ................................................................................. 5

POTENTIALLY RELATED CASE .......................................................................... 5

FACTS .................................................................................................................. 6

I.     ESPN'S CABLE TV DOMINANCE ............................................................... 6

    A.   ESPN: "The Everywhere Sports Profit Network" ......................................... 6

    B.   ESPN Becomes Disney's Cash Cow ........................................................... 7

    C.   ESPN's Most Favored Nation and Bundling Agreements with Cable TV Providers ...... 11

II.    THE CORD-CUTTING THREAT ................................................................. 16

    A.   Subscribers Begin to Abandon Cable and Satellite TV in Favor of Internet-Based Entertainment, including Streaming Subscriptions ........................ 16

    B.   Cord Cutters and the ESPN Subsidy ........................................................ 19

    C.   Disney Enforces Its Carriage Agreements' MFN Provisions Against Verizon, Preventing Verizon from De-bundling ESPN from Base Streaming Live TV Packages ........ 24

    D.   Disney Contemplates Its Own Standalone ESPN Streaming Product ........... 28

III.   THE ADVENT OF STREAMING LIVE TV .................................................. 32

IV.   DISNEY ACQUIRES HULU AND COMPETES DIRECTLY WITH STREAMING LIVE TV PROVIDERS ......... 36

V.    DISNEY USES ESPN AGREEMENTS WITH STREAMING LIVE TV PROVIDERS TO INFLATE PRICES TO PRE-CORD CUTTING, CABLE-TV LEVELS ........ 39

    A.   Disney Immediately Raises Hulu + Live TV Prices, and Competitors Move in Lockstep ........ 39

    B.   Disney's Negotiations and ESPN Carriage Agreement with DirecTV ........... 40

    C.   Disney and YouTube TV Enter into a New Carriage Agreement Covering ESPN ........ 43

    D.   Disney Captures Sling TV with a New Carriage Agreement ........................ 47

    E.   Streaming Live TV Prices Rise in Lockstep after Disney's Web of MFN Agreements .. 51

VI.   THE RELEVANT MARKET .......................................................................... 53

    A.   The SLPTV Market Is a Distinct Submarket .............................................. 53

B.   Market Participants and Market Concentration ............................................. 63

C.   The Relevant Geographic Market ................................................................. 64

D.   The Carriage and Streaming Infrastructure Barrier to Entry............................. 65

VII.   DISNEY'S AGREEMENTS WITH DIRECTV AND OTHER STREAMING TV PROVIDERS HARM COMPETITION IN THE STREAMING LIVE PAY TV MARKET .......................... 68

A.   Disney's Web of Carriage Agreements Force ESPN on Rivals and Consumers, which Has Allowed Disney to Raise Prices ......................................................... 69

B.   Disney Uses Hulu + Live TV to Set a Price Floor through Its MFNs' Price Terms........ 70

C.   Disney's Carriage Agreements Allows It to Impose Costs on Competitors .................. 71

D.   Disney's Carriage Agreements Strengthen the CSIBE by Requiring Content Negotiations with Disney to Effectively Participate in the Market ............................... 72

E.   Disney Harms Consumer Choice by Preventing Bundles without ESPN........................ 72

CLASS ACTION ALLEGATIONS.......................................................................... 73

CLAIMS FOR RELIEF ......................................................................................... 77

PRAYER FOR RELIEF......................................................................................... 80

JURY DEMAND ................................................................................................... 81

**INTRODUCTION**

1.      This is an antitrust lawsuit against The Walt Disney Company ("Disney") to remediate and recover for Disney's anticompetitive agreements with direct competitors in the market for streaming live pay television ("SLPTV")—live television streamed over the Internet to paying subscribers.

2.      Plaintiffs are subscribers to DirecTV Stream,[1] which is one of the largest providers of live television streamed over the Internet. Plaintiffs bring this suit under Section 1 of the Sherman Act to, among other things, recover the near doubling of their subscription prices as a result of Disney's anticompetitive agreements with DirecTV and other SLPTV providers.

3.      Disney owns, operates, and controls the second largest SLPTV provider, Hulu, which provides an SLPTV product called Hulu + Live TV. Disney also controls ESPN, the largest cost input into every SLPTV product in the country. Disney operates these businesses (ESPN and Hulu) as a single economic entity, allowing it to negotiate ***horizontal***, anticompetitive carriage agreements for ESPN and ESPN-related channels, which are the largest cost input to SLPTV products in the United States.

4.      Disney's carriage agreements with its SLPTV competitors contain two terms that provide Disney pricing power over the entire market. First, Disney's carriage agreements contain language requiring that base or lowest-priced bundles offered by SLPTV providers must include ESPN. Second, Disney's carriage agreements include Most Favored Nation ("MFN") clauses that put upward price pressure on every rival SLPTV product.

5.      Together, these carriage agreement mandates—which now cover all of Disney's leading competitors in the SLPTV Market—allow Disney to use ESPN and Hulu to set a price floor in the SLPTV Market and to inflate prices marketwide by raising the prices of its own products. And this is exactly what Disney has done in the past three years, since it took operational control of Hulu.

---

[1] In the past few years, DirecTV Stream has gone through a number of name changes at the behest of its corporate parents. Since 2019, the streaming live television product now known has DirecTV Stream has been called (at least) DirecTV Now, AT&T Now, and AT&T TV Now. Unless otherwise stated, this Complaint uses "DirecTV Stream" to include predecessor streaming live television services from AT&T/DirecTV.

6.      Since Disney acquired operational control over Hulu in May 2019, prices across the SLPTV Market, including for DirecTV Stream, have doubled. This dramatic, marketwide price inflation has been led by Disney's own price hikes for Hulu + Live TV, and has directly tracked Disney's competitor-by-competitor negotiation of new SLPTV carriage agreements over this time period.

7.      As for DirecTV Stream, controlled by television giant DirecTV and majority-owned by telecommunications giant AT&T, DirecTV's carriage agreements with Disney have resulted in a near-100% price increase of DirecTV Stream's base package, from $35 to $69.99.

8.      As explained below, Disney has entered into horizontal agreements with terms that directly increase SLPTV prices, set a price floor for the entire market, reduce consumer choice, and strengthen significant barriers to entry. Plaintiffs, who are SLPTV direct purchasers from Disney's co-conspirator and counterparty DirecTV Stream, seek damages as well as injunctive relief to halt and unwind Disney's anticompetitive practices.

## PARTIES

## I.      PLAINTIFFS

9.      Plaintiff Michelle Fendelander is a domiciled resident of Las Vegas, Nevada. She is a paid DirecTV Stream subscriber, and has subscribed continuously to DirecTV Stream (including its predecessors) since November 2018. Ms. Fendelander currently pays $107.99 per month for DirecTV Stream services.

10.     Plaintiff Ronda Lee Haines is a domiciled resident of Franklin, Massachusetts. She is a paid DirecTV Stream subscriber and has subscribed continuously to DirecTV Stream (including its predecessors) since 2017. Ms. Haines currently pays $94.99 per month for DirecTV Stream services.

11.     Plaintiff Michael Hughes is a domiciled resident of Johnston, Iowa. He is a paid DirecTV Stream subscriber, and has subscribed continuously to DirecTV Stream (including its predecessors) since August 2017. Mr. Hughes currently pays $69.54 per month for DirecTV Stream services.

12.     Plaintiff John Manso is a domiciled resident of Mount Vernon, Washington. He is a paid DirecTV Stream subscriber, and has subscribed continuously to DirecTV Stream (including its

predecessors) since November 2020. Mr. Manso currently pays $102.97 per month for DirectTV Stream services.

13. Plaintiff Jasmine McCormick is a domiciled resident of Rolling Meadows, Illinois. She is a paid DirecTV Stream subscriber, and has subscribed continuously to DirecTV Stream (including its predecessors) since 2018. Ms. McCormick currently pays $125.49 per month for DirecTV Stream services.

14. Plaintiffs paid prices for their DirecTV Stream subscriptions that were higher than they would have been absent Disney's anticompetitive conduct described in this Complaint.

## II.   DEFENDANT

15. Defendant The Walt Disney Company ("Disney") is a public company incorporated in Delaware and headquartered at 500 South Buena Vista Street, Burbank, California 91521.

16. Disney employs approximately 190,000 people (as of Oct. 2021). Disney's annual revenue was approximately $67.41B, $65.388B, and $69.607B, in 2021, 2020, and 2019 respectively.

17. Disney operates several lines of business, including the following relevant lines, which are operated through one or more subsidiaries:

- **ESPN**, branded television channels including nine 24-hour domestic television sports channels as well as radio stations. Disney controls ESPN with an 80% share. The remaining 20% share is owned by the Hearst Corporation.

- **ABC Television Network**, a major national television network, with approximately 240 local television stations reaching almost 100% of U.S. television households. ABC broadcasts programs in the primetime, daytime, late night, news and sports "dayparts." ABC cross-brands certain products with ESPN.

- **Hulu**, a subscription-based video streaming service. Hulu offers two products, a streaming video on demand services ("SVOD") and a live streaming television service, Hulu + Live TV, which Disney refers to in its 2021 annual report as a digital Over the Top MVPD service. As of the date of its 2021 annual report, Disney reported that it owned 67% of Hulu, with the remaining interest remaining in NBC Universal ("NBCU"). Disney has a put/call agreement with NBCU to purchase the remaining 33% interest beginning January 2024, and according to the New York Times, Disney has already committed to buying NBCU's stake for at least $5.8 billion. Disney has maintained full control of Hulu since at the latest May 2019.

18.     Disney operates Hulu with unfettered control and with a unity of interest and purpose, such that Disney and Hulu operate as a single economic unit. Indeed, Disney reports Hulu's profits and losses as part of its consolidated balance sheet. As Disney explained in its 2021 Annual Report (and Form 10-K), it has "full operational control" over Hulu.

19.     Disney operates ESPN directly, exercising complete operational and financial control over the ESPN lines of business. Disney reports profits and losses for its ESPN lines of business as part of its consolidated balance sheet. It operates with a unity of interest and purpose with ESPN. Indeed, Disney negotiates carriage agreements on behalf of ESPN, and Disney makes statements to the press and public about those carriage agreements on behalf of ESPN. ESPN is operated, and has been operated by, Disney executives and personnel, including Disney's James Pitaro, the chairman of ESPN and Sports Content.

20.     ESPN, Hulu, and Disney operate as a single economic unit, with a unity of purpose. Their profits and losses are shared and reported as part of Disney's balance sheet. Disney exercises operational control over the entire economic entity, and Disney negotiates contracts on behalf of the combined operations.

## JURISDICTION AND VENUE

21.     This action arises under Section 1 of the Sherman Act, and Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 15, 26). Plaintiffs and the proposed class seek to recover treble damages, interest, costs of suit, equitable relief, and reasonable attorneys' fees for their damages resulting from Defendant's anticompetitive agreements.

22.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

23.     Venue is appropriate in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Disney transacts business within the district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district.

24.     Disney maintains extensive operations in the Northern District of California, including as to its streaming business. As it states on its website, "the Bay Area is center stage for Disney Streaming,

Disney Pixar, Lucasfilm Ltd, and more." Disney maintains corporate offices and operations in California, including in San Francisco, San Jose, and in surrounding areas, such as Alameda and San Mateo Counties.

25.     In addition, relevant witnesses, including third-party witnesses, documents, and other evidence exist within this judicial district. For example, YouTube TV, the largest SLPTV provider in the United States and a counterparty to an anticompetitive Disney carriage agreement that contributed to the antitrust overcharge suffered by Plaintiffs, is located within this judicial district, both with respect to its ultimate corporate parent Alphabet (sometimes referred to in this Complaint as Google or YouTube), and with respect to Alphabet's YouTube subsidiary. Alphabet is located at 1600 Amphitheatre Parkway in Mountain View, CA 94043, within the Northern District of California. Alphabet's YouTube subsidiary is located in San Bruno, CA, within this judicial district.

26.     Additionally, relevant third-party witness DirecTV is headquartered in El Segundo, California, which is within the Central District of California, approximately 350 miles from the San Jose Division of this judicial district—approximately 70 minutes by commercial air. DirecTV has substantial operations and maintains employees in this judicial district. *See, e.g., Federal Trade Comm'n v. DirecTV*, Case No. 4:15-cv-01129-HSG (N.D. Cal.), Dkt. 1, at 2-3.

27.     The Court has general personal jurisdiction over Disney because its principal place of business is in California. Moreover, the anticompetitive conduct alleged in this Complaint was targeted at individuals throughout the United States, causing injury to persons in the United States, including in this state and district.

## DIVISIONAL ASSIGNMENT

28.     This is an antitrust class action for which "venue is proper in any courthouse in this District" under Gen. Order No. 44 § D.3 and Civil Local Rule 3-2(c).

## POTENTIALLY RELATED CASE

29.     This case is potentially related to the lower-numbered action *Biddle v. The Walt Disney Company*, Case No. 5:22-cv-07317-EJD (N.D. Cal.), which is presently pending before the Hon. Edward J. Davila of the San Jose Division of this judicial district.

**FACTS**

I.    **ESPN'S CABLE TV DOMINANCE**

    A.    **ESPN: "The Everywhere Sports Profit Network"**

    30.    The Entertainment and Sports Programming Network (ESPN) provides sports coverage as part of cable packages throughout the United States. It was founded in 1978 by Bill Rasmussen and his son Scott Rasmussen, then a 43-year-old eye doctor, along with an insurance agent named Ed Eagan.

    31.    ESPN was initially conceived as a channel dedicated to covering local Connecticut sports. However, within a year of the network's founding—after buying a transponder for satellite transmission—the Rasmussens broadened their new venture's ambitions, planning a channel that would cover all kinds of sports, 24 hours a day, with commentary shows tacked on. In March 1979—still pre-launch—the new network (then called just "ESP") secured its first broadcast rights, to certain NCAA athletic events, including college basketball. By May 1979, ESP had secured its first multi-million-dollar advertising agreement with Anheuser-Busch.

    32.    Shortly before its launch, the new network was renamed to ESPN-TV, and then just ESPN. The first ESPN broadcast occurred September 7, 1979, reaching 30,000 viewers. That same day, ESPN launched its first "SportsCenter" show, a fast-moving half hour of commentary and sports highlights.

    33.    ESPN's earliest broadcasts covered sports such as boxing, wrestling, and college soccer. From 1982 to 1984, ESPN expanded into mainstream professional sports, including a notable series of agreements with the National Basketball Association ("NBA"). In 1987, ESPN expanded to American football, with an agreement for partial rights with the National Football League ("NFL"). ESPN could broadcast certain games, so long as it simulcasted with national broadcast networks. In 1990, ESPN added Major League Baseball ("MLB") to its lineup, with a $400 million contract to broadcast certain games. From 2002 to 2004, ESPN expanded into hockey and soccer, inking agreements with the National Hockey League ("NHL") and Major League Soccer ("MLS"), respectively.

    34.    In April 2009, ESPN opened a broadcast production facility in downtown Los Angeles, across from the Staples Center. The facility housed two television production studios with digital control rooms and an ESPN Zone restaurant.

35.     Later in 2009—ESPN's thirtieth anniversary—the network launched its "30 for 30" documentary series, focusing on major sports stories and events that occurred over the thirty years that ESPN had been on the air.

36.     By 2012, ESPN had reached a new zenith. Due to its popularity and Americans' voracious appetite for live sports, ESPN had proliferated into several sister channels, including ESPN2, ESPNews, ESPN Classic, and ESPNU. Together, ESPN and its other channels had the broadest and largest number of television rights agreements with major sports leagues.

37.     Each channel expanded on ESPN's core business—sports broadcasting and commentary. By August 2012, ESPN's reach was unprecedented, with agreements with every major sports league to broadcast games live. As Bloomberg reported on August 30, 2012:

> The decentralization of media and the disruptive influence of technology—ubiquitous screens, plentiful bandwidth, and generous digital storage making it possible to watch anything, anywhere, anytime—have made big-ticket sports the only events that still regularly attract a mass global audience. No outlet owns the rights to more of those properties—including the National Football League, Major League Baseball, the National Basketball Association, major-conference college football, all four Grand Slam tennis championships, Major League Soccer, Nascar, and golf's U.S. Open, British Open, and the Masters—than ESPN. The company broadcasts more than half of all the live sports seen in the U.S. Through dozens of ESPN-branded TV, Web, and mobile platforms, it also shapes the ways in which leagues, teams, and athletes are packaged, promoted, marketed, and consumed by the public. In a real sense, ESPN no longer covers sports. It controls sports.

38.     ESPN's control over such a broad cross section of live sports meant that it was a large draw for TV viewers interested in sports.

39.     In 2014, ESPN made a big new bet on SportsCenter and other network programming, constructing a 194,000-sq. foot studio and media facility in Bristol, Connecticut. ESPN called this huge—and expensive—new facility Digital Center 2 ("DC-2").

**B.     ESPN Becomes Disney's Cash Cow**

40.     ESPN changed hands several times as it grew from ambitious startup to worldwide cable leviathan. In 1984 ESPN was sold by its then-parent company, Texaco Inc., to ABC for $188 million.

The acquisition by ABC provided that network with significant synergy, allowing the broadcast giant—which had long broadcast live sports under its own name—to access (and in some instances, recapture) a web of broadcast rights agreements ESPN had acquired since its inception. One year later, in 1985, Capital Cities Communications purchased ABC for $3.5 billion.

41.     Capital Cities operated ESPN as a separate entity, though certain on-air talent appeared on various ABC shows over the years; the two networks cross-promoted; and certain graphics and logos were repurposed from ABC to ESPN (Monday Night Football, for example) and vice versa. Nonetheless, ESPN remained its own separate constellation of live sports broadcasts and commentary shows.

42.     In August 1995, The Walt Disney Company announced that it was acquiring Capital Cities/ABC in a massive $19 billion deal, causing Disney's stock to rise shortly after the announcement.

43.     The deal was regarded as an opportunity for Disney to vertically integrate. As the Washington Post reported at the time of the announcement:

> Most of the initial excitement about the deal centered on what economists call "vertical integration": Disney provides programming, which ABC distributes. "Imagine promoting a Disney Sports movie like Mighty Ducks' *[sic]* on ESPN {owned by ABC} or Grace Under Fire' *[sic]* at Disneyland!" said Paul Marsh of NatWest Securities Inc., in a gush of praise typical of analysts this week.

(brackets in original)

44.     The merger was heralded as a potential broad-base integration of offerings among the combined companies. Disney had, however, in the process acquired an extremely valuable cash cow as part of the merger—ESPN.

45.     Over the years since Disney acquired ESPN, the network became a significant part of its portfolio of cash-generating assets. Disney's ESPN has extracted billions of dollars per year in fees from cable television networks throughout the United States.

46.     By 2012, a major portion of Disney's then-$84 billion valuation was being attributed to the cash flow generated by ESPN. As Forbes reported on November 9, 2012:

> Disney is a wildly diverse company with theme parks, movie studios, cruise ships, consumer products and the ABC TV network. But once again,

> cable networks were the driving force behind Disney's earnings, responsible for 57% of the company's total operating income. The cable channel doing most the heavy lifting for Disney is ESPN, which along with a contribution from the Disney Channel, generates more profits than the rest of Walt Disney combined.

47.    Although at the time of the acquisition, Disney, including its then-CEO Michael Eisner, predicted that ESPN and ABC would be valuable to Disney as an integrated part of the Disney empire, ESPN did not need deep integration with Disney to generate profits.

48.    This is because ESPN generates what are referred to as "affiliate" fees—fees charged to broadcast ESPN as part of a cable package. As Forbes explained in 2012, ESPN dwarfed other channels in the affiliate fees it commanded:

> Affiliate fees, paid by cable companies to channel owners each month, have steadily grown 8% annually at ESPN in recent years. ESPN and ESPN2 are both in more than 100 million homes and command $5.13 and $0.68 per month, according to SNL Kagan. The next highest among widely available channels are TNT at $1.18 and Disney Channel at $0.99 says Kagan. The average fee for basic cable channels is $0.26.

49.    By the early 2010s, ESPN had become a significant cost input into cable TV bundles sold around the country. It is no exaggeration to state that ESPN and its constellation of sister networks were the primary driver of basic cable price hikes for decades.

50.    By 2015, ESPN's affiliate fees had continued to balloon to approximately $6.55 per cable subscriber, per month. The expectation was that these fees would continue to rise in the next year. As *Forbes* reported in January 2015:

> ESPN is by far the most expensive cable network for providers to broadcast, and it's only expected to become even more expensive.
>
> The fee that cable providers pay the network for the rights in 2015 to broadcast the all-sports channel will cost an average of $6.55 per subscriber, per month, and is expected to cross the seven dollar mark in 2016 to as much as $7.21, according to estimates by SNL Kagan.

51.    When plotted against affiliate fees charged for other cable channels, ESPN was far and away the most expensive. As reported in 2015, both actual and expected affiliate fees for ESPN dwarfed

other channels:  Compared to other top cable networks, ESPN's affiliate fee is as much as four times the fee to broadcast TNT, which has the second highest fee behind ESPN at $1.58, as estimated for 2015.

52.     Even other all-sports networks, like those run by FOX, did not come close to the average monthly fees charged by Disney for its flagship ESPN channel.



53.     By 2017, affiliate fees had increased further, with the network generating $24.8 billion in revenue and $7.5 in operating income for Disney.

54.     And ESPN's monthly affiliate fee itself had also nearly doubled over the last several years. As the Motley Fool reported in 2020 about the network's 2017 fees:

> Each cable TV channel charges a nominal fee to be carried in a cable package. ESPN is notorious for being the most expensive channel, and it's not even close. As of 2017, cable subscribers were paying more than $9 per month for ESPN's top four channels (ESPN, ESPN 2, ESPNU, and SEC Network), and affiliate fees have continued to rise since then. For comparison, most channels charge less than $1. ESPN has about 80 million

subscribers. Even at 2017 affiliate fee rates, that would translate into roughly $8.6 billion in affiliate fees annually ($9 x 80m subscribers x 12 months).

55.     To simply carry ESPN as part of a cable bundle, cable providers throughout the United States were sometimes paying in affiliate fees as much as 15% or 20% of what the providers charged for basic cable. Through ESPN, Disney passively collected rents from every cable and satellite TV plan in the country.

## C.     ESPN's Most Favored Nation and Bundling Agreements with Cable TV Providers

56.     Although ESPN was an important part of cable TV packages for many subscribers—particularly Americans interested in live broadcasts and commentary regarding American football, basketball, baseball, and other sports that ESPN and its offshoots extensively covered—it was not a product universally sought by all households. Indeed, for almost half of American cable subscribers, ESPN was deadweight on their television bill—a surcharge for something subscribers would not otherwise pay monthly for.

57.     Perhaps recognizing this, for decades Disney used negotiation leverage with cable and satellite providers to contractually require that ESPN be included as part of basic cable or satellite packages. This created an equilibrium of sorts, despite wildly disparate demand among subscribers for Disney's expensive ESPN networks: there was enough overall demand by cable subscribers for ESPN to ensure that cable providers would pay Disney's high monthly prices to carry ESPN as part of basic cable package, and since American consumers who did not want ESPN were not willing or able to simply forego cable television (for a variety of reasons), millions of consumers who never wanted ESPN were not canceling their cable subscriptions due to Disney's tax.

58.     Disney leveraged this dynamic for years by continuing to enter into agreements with cable providers requiring that ESPN be included as part of any basic cable package, and by imposing as part of these agreements so-called "most favored nation" clauses with cable operators—clauses that insured that ESPN affiliate fees negotiated with any given cable operator would represent an industrywide price floor. Collectively, the requirement that ESPN be included in every basic cable package and the *de facto* price floor created by industrywide most favored nation clauses between Disney and cable operators meant

that Disney's eye-popping affiliate fees for ESPN represented a nationwide tax on all basic cable subscribers, paid into Disney's corporate coffers.

59.    That is, Disney aggressively used contractual mandates on cable operators, including most favored nation clauses, to ensure two things:

60.    First, Disney ensured that ESPN was a mandatory part of basic cable packages—for all subscribers, in all circumstances, in every region across the country. If a cable operator wanted ESPN, its base bundle needed to carry ESPN and its sister channels as part of the cable operator's basic (and cheapest) offering. Second, Disney's agreements ensured pricing parity. If prices for ESPN increased, Disney's web of agreements with providers ensured that cable package prices would all increase lockstep, as any discount to one cable or satellite provider would mean providing an untenable market-wide discount to all other counterparties.

61.    Together, these two aspects allowed Disney to reliably collect a tax on every cable TV subscription in the United States and gave Disney/ESPN the ability to increase prices without a competitive check.

62.    As the Wall Street Journal explained in June 2012, most-favored-nation clauses were significant aspects of agreements between cable channels and cable TV providers:

> Technically known as "most favored nation" clauses, their use in deals between cable operators and TV-channel owners has evolved over the past 25 years. Initially about economic terms, clauses are now being negotiated around digital rights, industry executives say. As a result, the clauses are in some cases limiting how and where channel owners can make their programming available online, industry executives say.

63.    A significant non-economic term was control over where and how a channel owner's content would be displayed, including through a new distribution medium—the Internet. Among all owners of premium/cable channels, Disney held the most leverage to write aggressive MFN clauses because of its ownership of ESPN. As the Wall Street Journal explained:

> In the television industry, most-favored clauses are no longer primarily about price. Partly that is because consolidation of TV channel ownership gave big entertainment companies the leverage to squeeze distributors for

higher prices, highlighted by growing complaints from cable and satellite operators about rising programming costs.

Walt Disney Co.'s ESPN, which commands among the highest subscription fees of any cable channel because of its dominance of TV sprots, has the leverage to write MFNs in such a way that the channel gets better deals, according to a person familiar with the matter.

"Our agreements reflect a fair exchange of value between ESPN and our distributors," said an ESPN spokeswoman.

At the same time, MFNs are being written to cover the rights that both distributors and channel owners have in use of TV content online. That comes as rising availability of online video is prompting channel owners to make some traditional TV content available online—while taking steps to ensure the existing TV-subscription business isn't undercut.

64.    Whispers of antitrust investigations by the United States DOJ abounded in this time period, rumored to be targeting the price impact of MFNs—specifically, agreements and clauses that constrained or practically impeded the lowering of prices by ESPN counterparties.

65.    The existence of such terms began to emerge publicly in the midst of hard-nosed carriage agreement negotiations. For example, in 2013, Dish Network sued ESPN to prevent it from providing better terms to other cable/satellite providers. Notably, a significant new issue was appearing in carriage negotiations—the ability to stream ESPN. As the Hollywood Reporter reported in February 2013:

If ESPN and Dish fail to reach a new agreement by about September 20, Dish will no longer be able to carry on its system ESPN, ESPN2, ESPN News, ESPNU, ESPN Deportes and ESPN Classic.

And yet, Dish is content to engage in a bit of brinksmanship this month in a $150 million lawsuit, accusing ESPN of violating its last deal by allegedly giving other distributors such as Time Warner Cable and Verizon more favorable treatment on subscriber rates, allegedly giving other distributors like Comcast more favorable treatment on packaging rights, and by allegedly allowing distributors to stream ESPN online to customers.

66.    Historically, cable/satellite providers controlled the "hard line" or the connecting substrate (such as satellite dish broadcast) into subscribers' houses. This meant that when a cable/satellite provider such as Dish negotiated with ESPN, it could rest assured that its subscribers had no other readily available way to obtain the same programming through an alternate medium.

67.     The advent of the Internet changed that. A mere price deal with ESPN was not enough for a cable/satellite provider to avoid being undercut on price by a competitor targeting that cable/satellite provider's subscribers. To seal off price competition on cable/satellite prices in the nascent Internet era, carriage agreements would have to ensure that a company that provided Internet services to households— *e.g.,* Verizon—was not given the right to broadcast ESPN over the Internet, undercutting a cable or satellite provider that had historically been the physical gatekeeper to ESPN's content.

68.     As the lawsuit between Dish and ESPN made clear, Dish sought to ensure that its rivals did not enjoy lower prices for ESPN, given the high, bundled pricing forced on Dish by its existing carriage agreements with Disney. As Hollywood Reporter explained:

> One of the more common aspects of contracts between distributors and networks is something called an MFN, or most favored nation, provision. For example, it means that when ESPN makes a deal with DirecTV for better terms than what ESPN first gave Dish, ESPN is then obligated to equal the playing field. In reality, though, the situation becomes very complicated as has become clear in the Dish-ESPN trial.
>
> For example, thanks to the 2005 ESPN-Dish agreement, Dish originally was set to pay Disney about 47 cents per subscriber per month this year for ESPN Deportes. That's on top of the more than $5 per subscriber per month Dish now pays for ESPN. Dish's attorney Barry Ostrager pointed out that ESPN gets the "highest license fee" any satellite or cable distributor pays for any network. And in an obvious play for a jury's pocket books, he added, "At least $5 of every bill is attributable to ESPN."

69.     The Dish-ESPN trial illuminated the problematic aspects of Disney's MFN agreements. One aspect of the agreements was what could—or must—go into base and lower-tier bundles:

> The trial has featured other ways that Dish believes it has gotten the sharp end of the industry stick. Dish asserts that its cable competitors have been able to put lesser channels like ESPNU and ESPN Classic onto less distributed tiers of cable packages and have given Comcast the right to distribute a channel like ESPNU to bars and taverns on an a la carte basis. (On the first point, ESPN believes that Dish is misreading the contracts. On the second point, ESPN says Dish got the same offer.)

70.     As the Dish-ESPN trial revealed, during the companies' negotiations, Dish initially demanded that ESPN prohibit other providers from permitting any online streaming of ESPN, "for fee or otherwise." After some wrangling ESPN and Dish ultimately agreed to language stating: "ESPN shall

not distribute the ESPN Networks . . . via the Internet without imposing a subscription fee specifically for such distribution."

71.     Disney's MFN agreements, which now encompassed both pricing and distribution terms, including regarding Internet streaming, were a significant part of Disney's leverage over cable/satellite providers, allowing ESPN's parent to passively collect a tax on cable and satellite TV subscriptions.

72.     As Disney reaffirmed and renewed its agreements with cable and satellite TV providers in the early 2010s, it continued to cause cable and satellite TV prices to rise exponentially, with ESPN serving as the primary cost input into every cable and satellite package throughout the United States. Through a web of MFN clauses in agreements between Disney and cable/satellite providers, prices could go up, but they could not come down.

73.     As The *Hollywood Reporter* presciently predicted, the clauses would likely mean higher cable bills:

> During the next week or so, the parties will continue to fight over their respective interpretation of contracts in the TV industry.
>
> Meanwhile, the coming negotiations between ESPN and Dish over a new licensing agreement provide a dark shadow to what's happening in a courtroom. Judging by the trial, the negotiation figures to be quite contentious. No doubt the stakes are high. Across the country, TV viewers are finding their cable and satellite bill increasing exponentially. That is due in no small part to money paid for live sports. For example, by the end of the decade, Time Warner Cable will be paying nearly $8 for each of its roughly 13 million subscribers *every month* just to carry one network—ESPN—which is nearly twice as much as TWC paid just a couple of years ago.

(emphasis in original)

74.     In 2012 and 2013, Disney needed to negotiate ESPN rights, including streaming rights, only with cable and satellite providers. As explained below, however, Internet-based streaming live pay TV ("SLPTV") soon emerged and posed an entirely new threat—cord cutters.

## II.    THE CORD-CUTTING THREAT

### A.    Subscribers Begin to Abandon Cable and Satellite TV in Favor of Internet-Based Entertainment, including Streaming Subscriptions

75.    In April 2013, a member of the New York Times editorial board posed what was then a radical new question: "How easy it is to live without cable TV?" The rise of streaming platforms like HBO, Amazon Prime, and Netflix meant that commercial-free, high-quality entertainment provided over the Internet was increasingly a viable option for consumers—and none of it required a cable or satellite TV subscription.

76.    Moreover, TV episodes were being distributed by episode or season by Apple's iTunes and Amazon's Prime Video digital distribution platforms, meaning that many Americans could watch (and pause, and rewatch, and return to) the latest episode of a TV show shortly after it first aired—months or even years before the so-called DVD/box set window, if any such release was ever made—without any cable or satellite TV subscription. As Vikas Bajaj's New York Times April 2013 op-ed recounted:

> How easy is it to live without cable TV? I have been finding out for the last several months while staying with a friend who, like several people I know, does not subscribe to cable or satellite TV. So far, thanks to Netflix and Amazon Prime's streaming of movies and TV shows, I haven't missed cable TV much, except maybe the HBO show "Girls." And when the sixth season of "Mad Men" kicks off on Sunday, I'll keep up with the dark lives of Don Draper and company by buying the whole season on iTunes for $22.99, and watching the episodes as they become available for download each week. Come May, when I move into my own place, I'll have to make a decision: Should I join the ranks of the so-called cord cutters, who rely solely on Netflix, iTunes and the rest of the Internet for TV (or use high-definition TV antennas to get broadcast stations)?

77.    For the first time, the Internet was becoming a viable distribution channel for Hollywood-style, premium video content, in part because of the then-increasing Internet speeds in homes around the country.

78.    Nonetheless, in 2013, cord-cutting meant going without significant offerings that only cable and satellite pay TV provided. More than 90% of households in the United States were cable or satellite TV subscribers, and the ability to watch live TV required such a subscription. One option, of course, was to purchase a digital television antenna to obtain a handful of digital broadcast channels

(generally, the major broadcast networks) over the air, but it was impossible at the time to obtain important television offerings—including essentially all non-network television channels—without a cable or satellite TV subscription.

79.     Notably, the April 2013 New York Times op-ed identified ESPN as a significant problem for cord cutters interested in sports:

> Media and cable executives don't appear too worried yet about cord cutting. There are still plenty of reasons to pay; I'll want ESPN during college football season and you can't get that on Netflix. And it's still hard for online video services to beat cable's selection of current shows and movies. But what happens to cable when technology and non-cable media companies close these gaps?

80.     Those gaps did indeed continue to close, but cable TV providers downplayed threat. As The Hollywood Reporter reported on March 4, 2013:

> Time Warner chairman and CEO Jeff Bewkes on Monday shrugged off any suggestions of cord cutting or cord shaving that could threaten the business of pay TV giants or his company's cable networks and lauded Netflix's first original, *House of Cards*, as a "pretty good" show.

81.     On September 24, 2013, Disney CEO Robert Iger appeared at a Goldman Sachs conference and also brushed off the cord-cutting threat.



82.     As reported by the Hollywood Reporter:

Walt Disney chairman and CEO Robert Iger at an investor conference on Tuesday discussed the outlook for Netflix, the cord-cutting debate and the future of the entertainment conglomerate's sports content juggernaut, ESPN.

Appearing at the 22nd annual Goldman Sachs Communacopia Conference in New York, Iger was asked about cord cutting by pay TV users. "So far we don't see evidence of this occurring," he said. But he added Disney and others must ensure they are offering content that is as strong as seen in the past via the pay TV bundle. Netflix is a different offer given its focus on library content, he argued.

Iger called the current pay TV network bundle "a really good bargain" for consumers. "I think the consumer is getting a good deal" from a $75 per-month pay TV package as is the pay TV operator, which can sell customers broadband and other services. "The cost of programming has increased . . . but they may have to accept lower margins in their video business," because they have added other profitable businesses, such as broadband.

(ellipses in original)

83.     The repeated refrain from pay TV operators and content providers was that although streaming services provided alternative sources for libraries of content, they were not reasonable substitutes for the content available through a traditional cable or satellite pay TV package.

84.     An early challenge to this narrative came in October 2014, when HBO announced that it would offer a subscription to its content—which was historically available only as part of a cable or satellite TV package—entirely over the Internet. As BuzzFeed News reported on October 14, 2014:

History may look back on today as the beginning of the end of the cable television bundle.

That's because HBO, the biggest network in the pay-TV universe, announced that it would make its HBO GO streaming service available to people without a pay-TV subscription starting in 2015.

85.     There was a network effect to this action: as cable-only subscription services, such as HBO, began to de-bundle their content from cable and satellite TV plans, cable and satellite pay TV began to lose its longstanding status as must-pay gatekeeper for important television content, making cord-cutting more feasible.

86.     The number of cord cutters increased significantly by 2015. Pew Research estimated that approximately one in seven Americans were cord cutters by December 2015:

> A shift in how people watch TV is underway, as the new Pew Research Center data suggest 15% of American adults are now "cord cutters"—that is, they indicate that they once had a cable or satellite TV connection, but no longer subscribe. Another 9% of Americans have never had a cable or satellite subscription at all, meaning that a total of 24% of Americans currently do not subscribe to cable or satellite TV in their homes (76% of Americans subscribe to pay TV service at home).

87.     Pew Research found that access restrictions played a significant part in the growing trend to eschew cable or satellite TV subscriptions, particularly for younger viewers:

> For these young people, alternative access to content is crucial. Some 75% of young adults without a cable or satellite subscription say they can access content they want to watch either online—perhaps by binge watching their favorite shows through an online service like Netflix, Hulu or Amazon Prime—or via an over-the-air antenna. Overall, 64% of those without cable or satellite TV cite alternative access to content as a reason they do not have cable or satellite service at home.

88.     Younger generations strongly preferred the flexibility of viewing content outside of their home, on various devices, and without entering into contracts with cable companies that forced content on them that they had little or no interest in paying for.

89.     Nonetheless, although services like HBO began to decouple from cable and satellite TV packages in 2015 and thereafter, ESPN remained part of base cable TV packages throughout the United States. For sport enthusiasts, it was a virtual necessity; for others, however, it was a tax forced on them if they wanted live television. And for everyone, ESPN distribution and pricing was governed by onerous Disney-forced contractual terms, including its MFN clauses.

**B.     Cord Cutters and the ESPN Subsidy**

90.     In the mid-2010s, Americans continued to cord-cut or otherwise eschew cable/satellite pay TV—in increasing numbers. In significant part, this was because of consumers' aversion to having to pay for channels they did not watch or want. As the New York Times recounted in 2016, as cord-cutting continued its rise:

> Every quarter for the last few years, hundreds of thousands of American households have put an end to their TV subscription, fed up with the costs of cable subscriptions, channels they never watch and the annoying commercials.

91.     Despite accelerating cord-cutting, ESPN maintained its hold on cable/satellite TV subscribers who valued live sports and sports commentary. Then-existing alternatives to cable and satellite TV simply did not offer even arguably competitive live sports and sports commentary alternatives.

92.     But ESPN's bulwark against cord-cutting by sports fans did not extend to nearly half of cable/satellite subscribers, who were indifferent to ESPN's content.

93.     Indeed, a January 2016 survey by BTIG research, the results of which were widely reported, showed that 56% of survey respondents would drop ESPN if it meant saving the $8 per month fee the network imposed on cable and satellite subscribers by virtue of Disney's onerous carriage rules. Worse yet, 85% of respondents would not pay $20 per month for ESPN as a stand-alone service—the approximate amount it would cost Disney to recoup its same exorbitant carriage fees without Disney's minimum carriage requirement for ESPN.



94.     Historically, ESPN's tax on cable television was obvious, but few alternatives had existed to obtain non-sports premium TV content outside of traditional cable or satellite pay TV bundles. As the Atlantic explained in December 2013, in an article titled, "If You Don't Watch Sports, TV Is a Huge Rip-Off (So, How Do We Fix It?):

> Are sports on TV a good deal? Depends.
>
> If you watch sports, millions of pay-TV households who never click on their ESPN channels are subsidizing your habit. If you don't watch sports, you're one of the suckers paying an extra $100 a year for a product you don't consume.

95.     The Atlantic article further observed that subscribers uninterested in sports were subsidizing those who were, because of cable bundling requirements:

> If you pay for cable and hate sports, then . . . well, gosh, I'm just really sorry. Actually, a better word would be *grateful*. You're subsidizing my ESPN addiction. Thanks.
>
> Seriously, though, you have the worst of two worlds. Channels competing over sports rights bid up the price of programming. The bundle pricing model means you have no choice but to pay what amounts to a mandatory sports tax. Media companies' all-or-nothing deal with cable providers means you have no choice but to pay at least $100 per year for sports you don't plan to watch.

(ellipses and italics in original)

96.     Cord-cutting posed a threat to this tax. Because Americans not interested in paying for sports were beginning to see viable options to traditional cable/satellite pay TV to obtain the most desirable non-sports pay TV content, these consumers could viably cut the cord. And, when these households did cut the cord, they opted out of their "sports subsidy" for cable and satellite TV subscribers who wanted sports content.

97.     Empirical evidence showed that this was, in fact, happening: the sports subsidy began to rapidly diminish year after year as non-sports pay TV programming became increasingly available outside traditional cable/satellite pay TV distribution. By 2017, cord-cutting had accelerated, leaving

sports enthusiasts shouldering more and more of the "sports tax" from cable and satellite TV subscriptions. As The Economist explained in May 2017:

> For much of this century ESPN, the television sports network, has been Disney's cash machine, collecting billions more dollars from American subscribers each year than the company gets from its blockbuster "Star Wars", Marvel and Pixar films combined. But for the past six years, fewer and fewer people have been paying for ESPN: the network's subscribers base has declined from a peak of 100m households in 2011 to less than 88m now. Why are fewer Americans paying for the sports leader?

> One big reason is that fewer people are subscribing to pay-television overall—a phenomenon known as "cord-cutting". As the bundle of channels offered to homes has grown fatter, it has also become more expensive—the typical pay-TV bill in America has nearly doubled in a decade to more than $100 a month. This has turned off customers and potential customers. Sports fans can get highlights free on social media; non-sports fans can get their fix from Netflix and Amazon. ESPN is by far the most expensive channel in the bundle—the network gets paid $7.86 per subscriber [per month], according to Kagan, a research firm, while no other basic cable channel commands even $2 per subscriber. Still, the cheaper channels are losing lots of subscribers too. TNT, owned by Time Warner, has lost more than 10m subscribers in the same period of time that ESPN has lost 12m.

98.    As the number and share of American cable and satellite pay TV subscribers diminished, ESPN would have to charge the remaining subscribers more to maintain its pay TV revenues. This could—and in fact, did—lead to a potentially negative feedback loop: cord-cutting caused the overall cable/satellite pay TV subscriber pool subsidizing sports to drop, which led ESPN to raise prices (carriage fees) to maintain revenues, which in turn further incentivized cable and satellite TV subscribers to cut the cord.

99.    The negative feedback loop was readily apparent to industry observers, and by May 2017, Disney's Iger had reversed course in his appraisal of the cord cutting situation. As USA Today reported that May:

> Wall Street has been concerned about declining subscribers of ESPN, a jewel in Disney's portfolio and a key profit generator. ESPN is in nearly 88 million homes, according to Nielsen, down from more than 100 million homes six years ago. "Those losses have come from cord-nevers, cord-cutters" and customers moving to TV packages without ESPN, Iger said

Tuesday during a conference call discussing Disney's second-quarter earnings.

100.    ESPN hemorrhaged customers from 2012 to 2017 as a result of cord cutting. ESPN (and its parent, Disney) faced two significant challenges as it sought to stanch the bleeding of Disney's most substantial profit center: First, it would have to preserve the existing subscriber pool that remained on cable and satellite TV; and second, it had to ensure that ESPN remained part of basic cable packages. A shrinking subscriber pool meant having to increase prices (carriage fees) to maintain revenue, and an ability to opt out of an ESPN subscription meant an end of the sports subsidy provided by the whole of the subscriber pool.

101.    Beginning in 2015 and accelerating through 2017, however, Disney faced two entirely new market developments that threatened its ability to maintain ESPN's subscription pool and its position as a mandatory part of basic cable packages.

102.    First, as described below, large providers like Verizon began (or sought) to introduce Internet-distributed "skinny bundles" comprising limited cable/satellite pay TV content—live TV bundles without the full, bloated mass of pay TV channels forced on cable/satellite TV subscribers as part of minimum "basic" pay TV packages. Importantly, an Internet-provided skinny bundle without ESPN meant an end-run around Disney's MFN contracts forcing ESPN on cable and satellite TV subscribers.

103.    Second, as described below, by 2017, new companies—who were not traditional cable companies—began providing live TV cable packages over the Internet. Although the decline in cable and satellite pay TV subscribers from cord-cutting had started to plateau by 2017, those who remained live TV subscribers were presented with a new option: streaming live pay TV over the Internet. This meant that Disney had to quickly adapt its business model and negotiation strategy to ensure that pay TV packages available through the new medium did not omit ESPN as part of their base plan—or otherwise threaten Disney's industrywide "ESPN tax." As described later in this Complaint, Disney ultimately entered into a series of anticompetitive agreements in order to maintain its ESPN profits—at the expense of American SLPTV subscribers like Plaintiffs and members of the proposed class.

### C. Disney Enforces Its Carriage Agreements' MFN Provisions Against Verizon, Preventing Verizon from De-bundling ESPN from Base Streaming Live TV Packages

104. As improvements in video streaming technology and the proliferation of mobile devices augured new possible ways for Americans to consume traditional pay TV content, companies situated in different parts of the information economy sought to deliver pay TV content in a way that avoided or pushed back against Disney's longstanding ESPN tax.

105. The first substantial volley against ESPN came from traditional cable and satellite TV providers that also controlled Internet Service Providers—*e.g.*, telecommunications giant Verizon. Although these companies had entered carriage agreements with Disney that required that ESPN be bundled as part of their *cable or satellite* TV base packages, often their carriage agreements did not expressly cover distribution of ESPN and other Disney pay TV channels *over the Internet*. Providers who could feasibly distribute pay TV channels over the Internet—principally major ISPs like Verizon—sought to use this contractual ambiguity to end-run Disney's long-running strictures on pay TV base packages. That is, they sought to offer a product that consumers had long clamored for, but which Disney's contractual requirements had effectively kept out of the cable and satellite pay TV market: the "skinny bundle."

106. Cord cutters and would-be cord cutters did not want all the channels forced on them—at significant price—by their cable or satellite pay TV providers, and were eagerly looking for bundles without expensive channels they did not often watch. ESPN was a primary target—and the primary culprit for aggressively rising basic subscription cable/satellite pay TV prices. ESPN was far and away the most expensive channel on basic cable, and for many subscribers, their strong preference (if such a product was on offer) would be a basic cable bundle without it. But Disney, through its well-established carriage agreements with cable and satellite TV providers, had for decades ensured that no such bundle could be offered as part of cable and satellite TV packages.

107. In short, Americans who subscribed to traditional cable or satellite TV *had* to pay for ESPN as part of their subscription—and the price was uniquely high (about $6-8 month, just for ESPN

carriage fees). But if a cable or satellite provider offered a bundle—*any* bundle—without ESPN, that provider risked breaching its carriage agreement with Disney.

108.    The ability to distribute traditional pay TV programming over the Internet, however, created a potential ambiguity in existing carriage agreements—and the tantalizing prospect that new agreements could be forged on a clean slate. Cable and satellite TV providers whose existing carriage agreements with Disney were silent (or at least arguably so) regarding over-the-Internet distribution saw an opportunity to offer novel configurations and types of bundles that appealed to diverse consumer preferences, rather than offering bloated minimum products based on Disney's longstanding "must-carry" mandates for its expensive cable channels.

109.    On April 19, 2015, Verizon introduced what it referred to as "skinny bundles," distributed over the Internet. These new Internet-based live television bundles were cable/satellite pay TV replacements, aimed at providing live television channels without the use of cable infrastructure, including hated cable TV box rentals and last-mile wiring.

110.    As CNET explained, the "skinny bundles" were significantly cheaper than basic cable TV plans and allowed subscribers to choose the channels that would be included:

> Starting April 19, Verizon's Fios television service will offer a "skinny bundle" option. Rather than being stuck with a standard, bundled TV service that includes seemingly every channel, no matter how niche, the skinny bundle has base channels, including local television networks and cable networks AMC and CNN, and the option to choose among seven genre-specific channel packs. Those genres include everything from kids to entertainment to sports.

> The standalone bundle service starts at $55 per month with the base and two channel packs. Each additional package, which has anywhere between 10 and 17 channels, costs customers $10 more. Better yet, channel packs can be swapped out after they've been on a customer's account for 30 days, so you could switch between them based on what shows you're interested in throughout the year.

111.    The new skinny bundles nodded to a clear trend in viewing habits: most cable/satellite subscribers did not watch much more than a dozen channels, and did not have an interest in the typical 200 or so channels bundled together as part of basic cable packages. As CNET explained:

1
2
3
4

> Providing customers more choice over what they want to watch seems to make sense if you consider the way Americans actually watch television. Nielsen last year released a study that found the average US household now receives 189 channels, but watches just 17. Interestingly, the average TV household has watched about 17 channels every year since 2008, but in 2008, the average home had just 129 channels and now carries about 50 percent more.

5
6

> Verizon's Ultimate HD plan, which sits outside its new skinny-bundle option, offers over 40 channels.

7
8
9

112.     The skinny bundles also provided an additional innovation—flexibility. Viewers would not be bound to their living room couches to watch live television. Live TV could be streamed to various devices, such as tablets, game consoles, and laptops, and all that was required was an Internet connection.

10
11
12
13

113.     Verizon's announcement was potentially devastating to ESPN, which Disney had strategically mandated as a baseline part of virtually every traditional cable and satellite TV bundle in the United States. Verizon's new move appeared to be an end-run around carriage agreements with Disney requiring that ESPN be carried as part of every basic cable or satellite pay TV package.

14
15
16
17
18

114.     Through its Fios skinny bundles, Verizon offered a baseline pay TV package that did not include ESPN, and it cost far less than the cheapest baseline pay TV packages available from cable or satellite TV providers across the United States. If Verizon's new offering received traction, it would jeopardize the then-nearly $6 per user, per month Disney was extracting from cable providers (and ultimately from cable/satellite subscribers).

19
20
21
22
23
24
25
26

115.     Worse yet, cable companies would compete head-on with Internet-based packages wherever they were, eroding the near-monopolistic dominance of individual cable providers within respective geographic regions that had traditionally protected profit margins—and carriage negotiations—in the alleged "natural monopoly" cable industry. The threat to cable companies' geographic hegemony directly threatened Disney's ability to comprehensively extract its ESPN across the entire pay TV industry: having negotiated a favorable carriage agreement with the local cable TV fiefdom would no longer be enough to prevent ESPN-less offerings for American consumers in various geographic areas.

27
28

116.     Days after Verizon's skinny bundle announcement, Disney sued Verizon over its "skinny bundle" through its ESPN subsidiary. As CNET reported in late April 2015:

> ESPN isn't a fan of Verizon's new way of offering cable channels under its Fios TV service.
>
> The sports network has sued Verizon for allegedly breaching its contract, which was earlier reported by CNBC.com. The lawsuit was filed in the New York Supreme Court.
>
> The dispute stems from Verizon's recently unveiled [skinny bundle], which gives consumers the ability to choose specific packages of cable channels which can be swapped in and out every 30 days. The skinny bundle offers more flexibility than the standard cable bundle, which provides a large number of preset channels.
>
> ESPN's lawsuit represents the first sign of resistance by the content companies, which are dealing with a [sic] shifting of viewing patterns as consumers increasingly opt to watch video online and on their own time. These viewers, known as cord-cutters since they've cut the cable TV part of their service, are forcing content companies to look at how they distribute their programming.
>
> The sports-programming giant believes Verizon's new bundle conflicts with their agreement. The lawsuit is seeking to enforce the terms of the contract, stop Verizon from implementing the new bundle and potentially pay damages.

117.     The lawsuit was commenced with an exceedingly thin set of pleadings. Disney avoided attaching its carriage agreement to public filings, and before any disclosure was required, the parties quietly settled the suit. As The Verge reported on May 10, 2016:

> ESPN and Verizon have resolved a legal battle that began when the popular sports network sued the FiOS provider over its unconventional "Custom TV" channel packages last year. Verizon announced more flexible (and slimmer) programming bundles last April that gave customers the choice of keeping or excluding ESPN from their main subscription. ESPN cried foul, claiming that Verizon's new approach violated the existing distribution agreement between Verizon and Disney, ESPN's parent company.
>
> Now both sides say they've settled the disagreement, but specific terms will remain confidential. ESPN and Verizon have each issued cozy PR statements about how important they are to each other. That's quite different from the war of words that ensued when this quarrel began.

> Verizon's Custom TV, squarely aimed at cord cutters (and an answer to internet TV services like Sling TV), offers a main bundle of channels for $55 and lets subscribers tack on additional content packs for more money. Under this model, ESPN and ESPN2 were broken off into an optional sports package, which didn't sit well with the sports programming giant. Now, the two companies have bridged their differences—and the resolution comes as others like YouTube and Hulu are reportedly working on cable replacements of their own.

118.     Verizon publicly capitulated after getting sued by Disney. As Fierce Wireless explained in a February 19, 2016 article:

> Verizon has announced a significant revamp to its FiOS Custom TV Package, significantly upping the number of channels in the base bundles.
>
> The move comes 10 months after Verizon ruffled programmer feathers with the "skinny" offering which initially offered a base selection of only around 40 channels. . . .
>
> Verizon is pricing these bundles at $70 a month for a triple-play that also includes FiOS internet and phone service.
>
> The revision comes after Disney and ESPN sued Verizon, claiming the downgrading of the channel into an add-on tier was a violation of its carriage agreement.

119.     As media commenters noted, Verizon and Disney had reached a détente as a dangerous new product offerings were on the horizon—live television services entirely over the internet, provided by non-cable companies like tech giant Google.

120.     Disney had avoided a disastrous end-run around its MFN agreements with its suit against Verizon, but—as explained below—faced an even more formidable threat ahead.

**D.     Disney Contemplates Its Own Standalone ESPN Streaming Product**

121.     Cord cutting cost ESPN a significant amount of subscribers—tens of millions—in the mid-2010s. However, by 2017, the tide was beginning to wane. Cord-cutters who could go without content exclusive to cable and satellite pay TV packages (including live events, day-and-date viewing, and live sports) had cancelled. The subscribers left, whether they wanted ESPN or not, wanted live television. Disney, however, could not maintain its historically massive television revenues without a large—near nationwide—subscriber pool paying the high prices it charged for ESPN.

122.    As the subscriber pool dropped, Disney considered various options to recapture lost revenue. One possible route was to provide a more expensive standalone ESPN streaming service, akin to what HBO had recently launched, that would not require a cable or satellite TV subscription. The price, however, would have to be significantly higher than the amount ESPN normally contributed to a standard cable TV bundle (*i.e.*, $6-8 dollars per month, per subscriber), or else ESPN risked incentivizing more cord cutting, further diminishing the pool of subscribers it could force to pay its monthly fees as part of basic cable.

123.    An article in Forbes titled "Should ESPN Launch a Streaming App?" analyzed Disney's strategic options in mid-2017. The question centered around the price Disney could garner for ESPN without bundling it with a cable package, and the effect on present revenue streams from this offering:

> Launching a standalone streaming app could help ESPN offset subscriber declines driven largely by cord-cutting and secular pressures. We believe that many cord-cutters would be willing to pay for a standalone ESPN app if one were available, and may actually be willing to pay more than the estimated $7.21 per subscriber per month that the network currently charges. This could help maintain—or even expand—margins, which is important as the company's massive content deals are largely fixed in nature. We estimate that this could lead to 6% annual revenue growth and a slight expansion in EBITDA margins, allowing operating profits to rise at an even more rapid pace.

124.    The problem, however, was catching a falling knife—that is, balancing the reduction in subscribers with the growth of a standalone service (with an optimized price). A standalone service could only co-exist with cable and satellite TV bundles if it did not exacerbate the cord cutting problem:

> A potential solution to ESPN's subscriber loss problem is a streaming app that provides internet-only access to its content at a per month subscription cost. As we pointed out earlier, a key factor behind ESPN's shrinking subscriber base is cord-cutting among cable TV subscribers as they switch to cheaper internet-based options. A dedicated ESPN streaming app could be priced appropriately to attract the price-conscious section of consumers who are unwilling to pay bloated monthly cable TV fees, but still want to watch their favorite live sports content that is exclusively available on ESPN.
>
> A key decision ESPN would have to make in this strategy is the appropriate subscription fee for such a streaming app. As ESPN is available as part of

bundles offered by popular existing internet-streaming platforms such as Hulu, Sling TV and DirecTV, the fee has to be largely similar to the price subscribers currently pay for an add-on ESPN package. At the same time, the fee cannot be too low, as it may not be enough to cover the fixed content costs as well as incremental operational costs linked to the streaming app (like additional infrastructure and related costs) in the long run. Another important criterion ESPN has to keep in mind while picking a subscription fee will be the potential cannibalization of traditional subscription revenues by the streaming app. After all, some existing and potential subscribers of ESPN's cable TV offering could use the opportunity to switch to ESPN's streaming service in an attempt to reduce their overall monthly cable bills.

125.    Disney faced an exceedingly difficult optimization problem. It could transition away from the market structure it long enjoyed—keeping basic cable and satellite TV packages captive and charging a passive tax—in favor of launching a streaming subscription product. Doing so, however, would accelerate the drop in revenue from existing subscriptions to cable and satellite TV—a massive portion of Disney's revenue and operating income. To make the transition, Disney would have to capture standalone subscribers at pace with its subscription losses, without increasing the velocity of subscription losses—including to its own new offering.

126.    ESPN already allowed cable and satellite TV subscribers (*i.e.*, people already paying for ESPN through a cable/satellite pay TV subscription) to stream certain live programming, but only if they authenticated as cable or satellite TV subscribers. ESPN had not provided—or even offered—that content on a standalone basis. However, by 2017, it appeared that ESPN was likely going to finally create a standalone streaming offering. Some media outlets reported on such a service as if it were inevitable, particularly after Disney's recent acquisition of a streaming video company called BAMTech for $1.58 billion.

127.    As inevitable as a standalone streaming offering covering all of ESPN's premium live sports and commentary shows appeared to be in 2017, it never happened. Instead, ESPN released a standalone complement called ESPN+, a standalone streaming service offering only tertiary and niche content—*e.g.*, soccer, college baseball, and Division I-AA football—not available through ESPN's actual pay TV networks.

128.   ESPN+ lacked, among other things, Bowl Subdivision (Division I-A) college football, ESPN's principal NFL broadcasts and coverage, and NBA games, as well as ESPN's flagship Sportscenter and commentary programs.

129.   Worse still, people who actually subscribed to ESPN+ (originally offered at $4.99 per subscriber per month) would see links to ESPN's flagship content—NFL games, major college football, NBA games, Sportscenter, and flagship studio shows/commentary—but upon clicking on such links, would be presented with a paywall requiring them to "sign[] in with your TV provider." These users (who had actually shelled out money for a standalone ESPN+ streaming product) still would have no way of accessing the content they actually wanted to watch—except for clicking a provided-by-ESPN link to *sign up for a pay TV subscription through a pay TV provider*:




130.   In short, ESPN+ was (at best) an add-on for people who already subscribed to ESPN's primary network(s) through cable and satellite, and at worst a fake streaming product to direct sports fans toward signing up for an expensive, full-bore pay TV subscription. It was not (and to this day, is not—

the above screenshots are taken from the ESPN app as of November 2022) the standalone ESPN product that many media observers had though was inevitable given changing economics and behavior in pay TV distribution.

131.    As Disney considered the standalone ESPN option, an entirely new means of live television distribution appeared—streaming live TV. Companies like YouTube, Hulu, and Sling began offering live television replacements that rivaled cable and satellite TV offerings in quality and number of channels.

132.    Disney now had a more important fight on its hands—it had to protect the base cable bundle it forced on cable subscribers. New entrants could not be allowed to sell live TV plans without bundling ESPN, or else they would spread cord-cutting even to the tens of millions of cable/satellite TV holdouts, destroying the passive tax Disney collected from traditional cable and satellite TV providers' basic cable packages.

## III.    THE ADVENT OF STREAMING LIVE TV

133.    In January 2015, Dish announced a new product through its Sling TV subsidiary, which provided live television over the Internet. This new product offered subscribers the ability to watch a subset of traditional cable channels without a cable or satellite TV subscription.

134.    The new offering did not, however, include local television channels, nor many of the most popular and desired cable channels, such as AMC and FX. Nonetheless, while not a cable replacement, Sling's new product was the first in the United States to offer a meaningful live TV alternative over the Internet.

135.    Sling TV's product announcement in 2015 represented the birth of what would later be referred to as a Virtual Multichannel Video Programming Distributor ("vMVPD"). MVPD (*sans* "v") had long been the industry moniker for cable and satellite TV services—pay TV providers that used hard cable or satellite infrastructure to transmit and distribute multiple television channels (*i.e.*, all the cable operators and large dish/satellite TV providers familiar to Americans). However, unlike traditional MVPDs, vMVPDs did not use proprietary cable or dish transmission media to bring pay TV into American homes, but instead relied on existing Internet infrastructure to transmit live pay TV channels.

136.    To consumers, the new vMVPDs served the same role as traditional cable and satellite TV providers, and quickly came potential alternatives to legacy/traditional cable/satellite pay TV. At the same time, vMVPDs were different from streaming on-demand providers, like Netflix, as vMVPDs packaged live pay TV channels from various sources into a single bundle, much like traditional MVPDs (*i.e.*, legacy cable and satellite TV providers). As The Wrap explained:

> Virtual multichannel video programming distributors (vMVPD)—also referred to as streaming TV services—aggregate live and on-demand TV and deliver the content over the internet in a linear fashion. vMVPD services resemble the familiar layout of cable packages where users can browse a guide or flip through channels that stream programming 24 hours a day. These services are often used by recent cord-cutters who want to keep select channels from their cable packages but at a lower price.

137.    After Sling TV's announcement, several other vMVPDs emerged, offering what appeared to be alternatives to cable and satellite TV subscriptions, but at significantly lower prices.

138.    On November 28, 2016, DirecTV, then owned by AT&T, announced its own streaming live TV service. As reported by The Verge:

> After months of rumors, AT&T officially unveiled its DirecTV Now internet TV streaming service this afternoon at an event in New York City. The product, which starts at $35 per month, is meant to compete with traditional cable providers and a wave of web TV offerings including Dish's Sling TV, Sony PlayStation Vue, and upcoming services from Hulu and YouTube. DirecTV Now launches Wednesday, November 30th, in the US on iPhone, Android, Amazon Fire TV, Chromecast, and PC/Mac. Roku compatibility will arrive later this year.

139.    DirecTV had negotiated with virtually every major live TV network and offered several packages at various price points—all far lower than the average $70-120 packages offered by traditional cable and satellite TV providers:

> Like its over-the-top rivals, DirecTV Now will let customers stream live programming on smartphones, tablets, and PCs—no cable box necessary— and requires no long-term contracts or commitments. For a limited time, AT&T will offer the "Go Big" channel tier with 100 channels for $35 per month. (The normal $35 base package is limited to "60+ channels.") If you sign up in time, the offer will remain valid each month until you cancel. But that $35 rate is *not* the long-term pricing for 100+ channels. DirecTV

> Now offers step-up subscriptions that include other channels and content
> for a higher monthly cost.

(emphasis in original)

140.    The multitude of new vMVPD offerings—offering much of the same content as legacy MVPDs, but without the freight of bloated minimum channel packages and baseline prices inflated by carriage agreements like Disney's—threatened to re-accelerate the erosion of the traditional basic cable/satellite pay TV package, and perhaps finally signal its demise.

141.    In March 2016, Sony's PlayStation announced its own streaming live TV-over-the-Internet plan, called PlayStation Vue. Sony's plan started with a slim 55+ channel bundle at $29.99 a month, with more expensive plans that included sports channels ranging from $34.99 to $44.99 per month. Again, sports channels were, for the first time, not forced on base package subscribers, creating yet another alternative to traditional cable and satellite TV packages at approximately half the price.

142.    On February 28, 2017, after a year of rumors, Google's YouTube announced a live TV offering, called YouTube TV. YouTube TV would provide access to approximately 50 live channels, including the major networks, for $35 per month—far lower than the price of traditional cable and satellite TV packages. As TechCrunch reported:

> Today, YouTube confirmed how its channels will be bundled and priced.
> The service is fairly low-cost, with a family of six accounts available for
> $35 per month, and no long-term contract required. Earlier reports from
> The Wall Street Journal set pricing for the service somewhere between $25
> and $40 per month.

143.    A few months later, Hulu entered the field with its own streaming live TV-over-the-Internet offering, called Hulu + Live TV. The company—then a joint venture between News Corporation (owner of 20th Century Fox), Comcast (owner of NBC Universal), Disney, and Time Warner—announced its new vMVPD service on May 3, 2017, during Hulu's annual "Upfront" presentation. Hulu's new Live TV service would be priced at $39.99 per month and would include approximately 50 live television channels.

144.    Notably, the new vMVPDs almost all included ESPN as part of their lower-cost offerings. The offerings were made pursuant to newly negotiated contracts between each new vMVPD and Disney,

and appeared to fall outside the bounds of the MFN clauses Disney had for years negotiated with cable and satellite TV providers.

145.     Although the new vMVPD offerings created the opportunity for Disney to recapture subscribers it had lost to cord cutting, the net effect was the same risk to Disney's industrywide ESPN tax that would have been posed by actually launching a standalone full-ESPN streaming option: cable and satellite TV subscribers who had been paying $70 or more for base cable/satellite TV packages could now obtain live television channels, including ESPN, for nearly half the price. This meant that although ESPN garnered additional subscription revenue from the new vMVPD offerings, they accelerated ESPN/Disney's cable and satellite TV subscription losses.

146.     This time, unlike when Verizon challenged Disney's mandatory tax on basic cable packages two years earlier, Disney did not have the leverage to sue the new entrants or withdraw its channel from their offerings. The new Internet-based distribution of streaming live TV alternatives to traditional cable and satellite pay TV bundles posed an existential threat to Disney's ESPN cash cow.

147.     Faced with the choice of either accepting lower subscription revenues for ESPN and/or launching its own full-ESPN streaming service and cannibalizing its existing revenue, Disney chose neither. Instead, Disney chose to enter the Internet live television distribution business itself and reassert contractual control over its actual and potential competitors, allowing the company to save its ESPN cash cow both on and off Internet-based live TV platforms.

**IV.    DISNEY ACQUIRES HULU AND COMPETES DIRECTLY WITH STREAMING LIVE TV PROVIDERS**

148.    On December 14, 2017, Disney announced that it would acquire Rupert Murdoch's 21st Century Fox for approximately $13.7 billion.



149.    The acquisition included some of the most valuable properties in entertainment. As the Disney press release stated:

> Combining with Disney are 21st Century Fox's critically acclaimed film production businesses, including Twentieth Century Fox, Fox Searchlight Pictures and Fox 2000, which together offer diverse and compelling storytelling businesses and are the homes of *Avatar*, *X-Men*, *Fantastic Four* and *Deadpool*, as well as the *Grand Budapest Hotel*, *Hidden Figures*, *Gone Girl*, *The Shape of Water* and *The Martian*—and its storied television creative units, Twentieth Century Fox Television, FX Productions and Fox21, which have brought *The Americans*, *This Is Us*, *Modern Family*, *The Simpsons* and so many more hit TV series to viewers across the globe. Disney will also acquire FX Networks, National Geographic Partners, Fox Sports Regional Networks, Fox Network Group International, Star India and Fox's Interests in Hulu, Sky plc, Tata Sky and Andemol Shine Group.

150.    The acquisition provided Disney a massive complement to its existing network television holdings, including its ABC-related holdings. Network television properties, however, had long since part of the Disney portfolio. This acquisition, however, included something novel for Disney—a read-made vehicle for distributing TV content over the Internet. Thanks to Fox's preexisting one-third stake in the company, Disney was quietly acquiring majority ownership in and control over Hulu as part of its Fox acquisition.

151.    Just months prior, Hulu had posed a new and potentially existential threat to Disney's ESPN dominance. It had introduced a live television product that massively undercut the price of cable and satellite TV subscriptions that bundled ESPN with minimum, basic cable packages.

152.    The consummation of the Fox acquisition would give Disney not only one of the largest portfolios of live television properties, but one of the foremost entities for distributing live television content over the Internet—potentially a means of distributing such content that would not require contested contractual negotiations with cable and satellite TV operators.

153.    On July 27, 2017, Disney's acquisition of Fox received shareholder approval. By May 2019, Disney had obtained full control over Hulu itself, including its Hulu + Live TV product, by buying out Comcast's share of the company, which had remained after the Fox acquisition. As Vanity Fair reported:

> Well, it's official. On Tuesday, Disney and Comcast jointly announced that Disney will seize full operational control of Hulu, effective immediately. Following its acquisition of Fox, Disney had controlled a majority of stakes in Hulu—but until today, a third of the company was still under the stewardship of Comcast. Within five years, the agreement stipulates, Comcast can require Disney to buy out its share of Hulu for a minimum price of $5.8 billion—but Disney can also compel Comcast, which owns its 33 percent share through its acquisition of NBCUniversal, to sell of its fair market value on that same timeframe.

154.    The agreement provided Disney with full operational control and the ability to buy out Comcast's stake entirely. (Indeed, Comcast executives told CNBC in September 2022 that Disney would be carrying out such a buyout, whether Comcast wanted it or not.) As the Wall Street Journal reported in May 2019:

Under Tuesday's agreement, Comcast—Hulu's last remaining minority stakeholder—can require Disney to purchase the one-third stake its NBC Universal subsidiary owns in Hulu as early as 2024, the companies said.

Disney can also require NBC Universal to sell that stake to Disney for at least $9 billion, under a guarantee that Hulu's equity value at the time of a deal be at least $27.5 billion. Just last month the streaming services was valued at $15 billion, when another majority shareholder, AT&T Inc., agreed to sell its stake back to Hulu. . . .

Comcast on Tuesday said it would give up its three seats on the Hulu board. For Disney, the arrangement helps clear a path for the entertainment giant to manage Hulu without having a competitor at the table to weigh in on strategy. Although Disney already controlled the Hulu board, the bylaws of the company gave some veto power to Comcast.

155.    Within months after acquiring operational control over Hulu, Disney began making sweeping changes. In January 2020, Disney said goodbye to Hulu's existing CEO, Randy Freer. Disney immediately restructured Hulu such that it fell under the purview of the part of its organization overseeing ESPN and its Disney+ streaming service, namely under Kevin Mayer, Disney's direct-to-consumer chief. As the WSJ reported:

Randy Freer is exiting as chief executive of Hulu as Walt Disney Co. integrates the streaming service more closely into its direct-to-consumer business operations, the company said Friday.

The move comes just months after Disney took oversight of the programming operations at Hulu and as competition in the streaming marketplace is intensifying.

Disney acquired control of Hulu last year as part of its acquisition of 21st Century Fox entertainment assets.

As part of the restructuring, the business operations that had reported to Mr. Freer will now report to their counterparts at Disney. Kevin Mayer, Disney's chairman of direct-to-consumer and international operations continues to have oversight of Hulu.

Mr. Mayer's unit also oversees several other streaming services including Disney+, which launched last November, ESPN+ and India's Hotstar.

156.     Under Mayer, Disney's strategy immediately focused on leveraging Hulu + Live TV and ESPN together to recapture the ESPN subscription revenues Disney had lost to cord-cutting and to streaming live pay TV entrants, including Hulu.

## V.     DISNEY USES ESPN AGREEMENTS WITH STREAMING LIVE TV PROVIDERS TO INFLATE PRICES TO PRE-CORD CUTTING, CABLE-TV LEVELS

### A.     Disney Immediately Raises Hulu + Live TV Prices, and Competitors Move in Lockstep

157.     After taking control of Hulu in May 2019, Disney immediately raised the price of Hulu's Live TV offering by $10 in November 2019, bringing the cost of the base package to $54.99 per month. At the time, Hulu + Live TV had 2.7 million subscribers—approximately half of all subscribers to streaming live TV platforms, including former leader Sling TV.

158.     Competing platforms followed suit, with no significant price competition.

159.     On October 18, 2019, AT&T/DirecTV's streaming live TV offering, formerly known as DirecTV Now, increased its base package price to $65, a $15 per month increase.

160.     By the end of the year, PlayStation Vue shuttered, eliminating a major source of price competition for Disney's streaming live TV offering.

161.     Sling TV, which did not have the same number of channel offerings as YouTube TV or Hulu TV, raised the price of its base offering by $5 per month, bringing its base plan to $30 per month.

162.     On June 30, 2020, YouTube TV raised prices by $15 per month, increasing the price of its base plan from $50 to $65.

163.     One year later, in November 2020, Disney raised the price of Hulu's live TV offering again by an additional $10 per month, bringing the price of its base plan to $64.99.

164.     With each price increase, the price of Hulu + Live TV further approached the average cost of basic cable and satellite TV packages, pushing an American consumer choosing between traditional cable/satellite pay TV and Internet-based live TV toward the point of indifference.

165.     In its Annual Report and Form 10-K for 2021, Disney reported a 21% increase in revenue per user for its combined Hulu + Live TV and SVOD product, with revenue per user increasing from

$67.24 in 2020 to $81.35 in 2021. In its financial filings to the SEC for Q3 2022 (on Form 10-Q), Disney reported that revenue per user for its Hulu + Live TV and SVOD product has increased to $87.92.

166.    Disney controlled not only the then-largest streaming live TV platform, Hulu + Live TV, but also the primary cost input into all of its competitors' offerings—ESPN. Disney's ability to control Hulu's prices, along with the input costs of competitors, meant that it could make Internet-based live TV similar in cost to traditional cable and satellite packages, giving ESPN's monthly subscriber tax a second wind.

167.    From the moment it obtained control over Hulu, Disney raised prices with impunity—as well as the primary cost input of its competitors. But Disney faced a significant hurdle on the horizon—the expiration of its first round of carriage agreements with rival streaming live TV providers.

168.    As Disney raised prices through Hulu, it had to ensure that the next generation of carriage agreements maintained Disney's ability to (a) control the input costs of competitors by forcing ESPN onto base packages, and (b) raise prices on its own Hulu + Live TV product without a competitive check.

169.    Disney was willing to play hardball to meet both goals. Indeed, it had to, in order to maintain its historically bloated cable revenues and profits—otherwise a competitor could offer a base streaming live TV plan without ESPN at a significant discount, both undercutting Hulu's live TV offering and providing captive ESPN subscribers an out from Disney's monthly tax.

## B.    Disney's Negotiations and ESPN Carriage Agreement with DirecTV

170.    The first major carriage agreement negotiation Disney faced after taking control of Hulu was with AT&T's DirecTV, which offered a rival streaming live TV offering over the Internet (at that time called "AT&T TV Now").

171.    As Disney's existing carriage agreement with AT&T approached expiration in Fall 2019, Disney began to publicly posture, warning DirecTV subscribers that they would soon lose access to ESPN and other Disney-controlled channels. As The Hollywood Reporter reported on September 10, 2019:

> Disney has begun warning AT&T and DirecTV video subscribers that they
> may soon lose ABC, ESPN, Disney Channel, Freeform and other channels
> due to a carriage dispute between the two companies.

> "Our contract with AT&T for the ABC, ESPN, Disney, and Freeform networks is due to expire soon, so we have a responsibility to make our viewers aware of the potential loss of our programming," a Disney spokesperson said in a statement Tuesday. "However, we remain fully committed to reaching a deal and are hopeful we can do so."

172.    In service of its hard-nosed AT&T negotiations, Disney leveraged its largest megaphone—particularly for a message directed at those who value live sports programming. That is, it began running warnings during ESPN's Monday Night Football, far-and-away the most-watched show on cable, and one of the most-watched programs in the United States, across all television channels and networks:

> Disney began running the warning during *Monday Night Football* on ESPN last night. In a message to DirecTV subscribers, Disney wrote that "[S]o far AT&T has refused to reach a fair, market-based agreement with us, despite the fact that the terms we are seeking are in line with recent marketplace deals we have reached with other distributors."

173.    Disney even aggressively displayed its message in a ribbon at the bottom of Monday Night Football games—"ATTENTION CUSTOMERS, DON'T LOSE ESPN. CALL NOW"—displaying a toll free number for customers to call.



174.    Five days later, it appeared that AT&T had capitulated. Rumors circulated that AT&T had given in to Disney's carriage agreement demands. On September 22, 2019, the companies announced a deal.

175.    Just weeks later, AT&T raised the price of its live TV streaming service base package by $15, to $65. As reported by Variety on October 18, 2019:

> AT&T is instituting a substantial price hike for its live TV streaming service AT&T TV Now: Customers who have subscribed to the service's basic "Plus" package will see their bill go up by $15, to a total of $65 per month, starting next month.
>
> The telco has started to inform existing subscribers about the price increase, which was also confirmed by a spokesperson. "We're adjusting our pricing to reflect the cost to deliver content to our customers," the spokesperson told *Variety*. "Customers can contact us at any time to review their plans or make account changes."
>
> Pricing for customers grandfathered into older plans is apparently also increasing, according to posts on social media. When AT&T first launched the streaming service under the DirecTV Now branding, it signed up early subscribers for just $35 per month. One of those early subscribers said on Reddit that he had been told his pricing would go up from $50 to $85.

176.    The AT&T/DirecTV Now price increase paved the way for Disney to again increase Hulu + Live TV pricing a month later, in November 2019.

177.    After the Disney-AT&T agreement and another Disney price hike, Hulu + Live TV was priced at $55. But AT&T/DirecTV Now had been forced to raise its base package price even higher—an additional $15, to $65 total. In short, through its new carriage agreement with AT&T, Disney not only ensured that AT&T/DirecTV Now could not undercut Hulu + Live TV on price (particularly through base carriage requirements), it ensured that its rival AT&T's costs were high enough for streaming live TV programming that AT&T/DirecTV Now had to push its base price, which had to include ESPN, well above Hulu + Live TV's price, even after an additional hike by Disney. It was the late 2000s all over again: Disney was using carriage agreements to extract an industrywide tax, except this time it was using Hulu to raise prices marketwide among horizontal competitors.

178.    The price differential was ruinous for AT&T's streaming live TV offering. AT&T/DirecTV Now began to hemorrhage subscribers. By the end of 2020, it had lost approximately 30% of its subscribers. It simply could not lower prices to attract new customers. During the same period, Hulu's live TV offering surged in subscribers, making it the number one streaming live TV service in the United States.

179.    The net effect of the 2019 Disney-AT&T agreement pointed to a tried-and-true tactic for ESPN—using MFN clauses in carriage agreements to ensure that ESPN remained part of AT&T/DirecTV's base streaming live TV offering, and using Disney's control over a major cost input to curtail a rival's ability to offer prices lower than Disney's now-controlled horizontal competitor Hulu.

### C.    Disney and YouTube TV Enter into a New Carriage Agreement Covering ESPN

180.    Disney had used its carriage agreement negotiations, including its leverage over Monday Night Football and ESPN, to push AT&T/DirecTV into a losing position—that is, unable to lower its costs and base package prices for its AT&T/DirecTV Now streaming live TV service. It did this by, among other things, forcing ESPN into AT&T/DirecTV's base tier offering for streaming live TV, directly raising its rival's costs and indeed, consumer-facing prices—by $15 per subscriber, per month. Disney benefited, both through ESPN and through Hulu.

181.    However, this was only a short-term band aid for Disney's pay TV revenues and profits. In particular, Google's YouTube TV was rapidly growing in the streaming live TV market in 2019, and with Google's reach and resources, could quickly pose a significant threat to the prices Disney could extract through its Hulu + Live TV product (by then the market leader), including through ESPN—if, that is, Google's carriage agreement with Disney did not reflect the same terms that Disney had just extracted from AT&T.

182.    Google's YouTube TV had crossed the 1 million subscriber mark in March 2019. This was about half of the market-leading 2 million subscribers Hulu + Live TV had during this time period.

183.    However, during this time, Google had a legacy carriage agreement with Disney, which among other things required that Google carry ESPN as part of its base streaming live TV package. Because of this existing agreement with Disney to, among other things, carry ESPN as part of its base

package, YouTube TV continued to mirror price increases by Disney's Hulu in 2019, 2020, and early 2021.

184.   By the first quarter of 2021, YouTube TV had tripled in subscriber base, with approximately 3 million subscribers. By then, Hulu's live TV product had garnered approximately 3.8 million subscribers. YouTube TV and Hulu's live TV products were neck and neck (and together dominated the streaming live pay TV market).

185.   However, so long as Google's existing carriage agreement with Disney remained in effect, YouTube TV had no meaningful way of lowering prices to gain significant market share against Disney's Hulu + Live TV. After all, its largest single cost input was carrying ESPN and Disney's other properties.

186.   That, however, was about to change. The carriage agreement between Google and Disney covering YouTube TV was about to expire at the end of 2021, and the companies began posturing for aggressive negotiations.

187.   In late 2021, Disney rolled out the same negotiation tactics it had executed successfully against AT&T/DirecTV two years earlier. Thus, Disney began to tell YouTube TV's customers that they would soon lose ESPN and other Disney-controlled channels if YouTube TV did not reach a new carriage agreement, and urged them to lobby Google to keep Disney-owned properties like ESPN on YouTube TV.

188.   Google—itself a notoriously aggressive negotiator—responded to Disney's outreach to YouTube TV customers with a loud public campaign of its own. Google publicly threatened to offer a baseline YouTube TV package without ESPN if it could not reach a carriage agreement with Disney—a package at a significantly lower price than prevailing package prices on streaming live TV services. Notably, in doing so, YouTube TV made clear precisely how much ESPN was adding to its base bundle— $15 dollars. As Engadget reported on December 14, 2021:

> YouTube TV has warned viewers that channels including ABC, ESPN, FX and others may disappear by 11:59 PM on December 17th if it can't come to terms with Disney over carriage fees. If that happens, YouTube TV will lower its price by $15 (from $65 to $50) while Disney content remains off the service.

189.   The sticking point in the negotiations appeared to be a familiar one—an MFN agreement that would ensure price and term parity with Disney's other customers, including Disney's own Hulu + Live TV product. Google's statement to the press made that clear:

> "Disney is an important partner for us. We are in active conversations with them and are working hard to keep their content on YouTube TV," [Google] said in a press release. "Our ask of Disney, as with all of our partners, is to treat YouTube TV like any other TV provider—by offering us the same rates that services of a similar size pay, across Disney's channels for as long as we carry them. If Disney offers us equitable terms, we'll renew our agreement with them.

190.   Google was well aware that a new carriage agreement with Disney would likely give its principal competitor in the streaming live TV market a direct input into YouTube TV's most significant cost, just as Disney had done with AT&T/DirecTV.

191.   The press continued to report that negotiations had stalled between Disney and Google over MFN terms in the new carriage agreement being negotiated between the parents of the two leading competitors in the streaming live pay TV market. As Ars Technica reported on December 14:

> YouTube's statement that it wants "equitable terms" indicates that it is seeking a most-favored-nation (MFN) clause from Disney. . . . YouTube's demand for an MFN clause was also one of the sticking points in its recent dispute with the Comcast-owned NBCUniversal. In that case, the companies had to agree to a short extension to avoid a blackout when the original contract expired. One day later, they announced a multiyear deal to keep NBC on YouTube TV.

192.   As other outlets, including TechHive also reported, the central question during Disney-Google negotiations in late 2021 was the substance of the MFN clause in a new carriage agreement between the companies, with Google seeking to ensure that a lower price for Disney-owned content (principally, ESPN) offered to another streaming live TV provider would be offered to Google as well.

193.   On December 18, 2021, the game of chicken intensified. YouTube TV subscribers lost access to ESPN. As the Wall Street Journal reported that day:

> YouTube TV subscribers lost access to channels including ESPN and FX after YouTube's agreement to carry programming from Walt Disney Co. expired Saturday. . . . "We've been in ongoing negotiations with Google's YouTube TV and unfortunately, they have declined to reach a fair deal with

us based on market terms and conditions. As a result, their subscribers have
lost access to our unrivaled portfolio of networks," a Disney spokeswoman
said in a statement.

194.    The Wall Street Journal reported that the negotiations had fallen apart over the MFN
clause:

The companies are fighting over distribution fees for the Disney channels.
A sticking point is YouTube TV's request for a clause that would guarantee
it pays the same rate as distributors of a similar size, according to people
familiar with the matter.

195.    Again, Google publicly put a price on what an ESPN-less YouTube TV bundle would
look like. It would be $15 per month cheaper:

YouTube TV carries more than a dozen Disney channels, plus local
broadcast channels. The loss removes a sizeable chunk of YouTube TV's
offering. YouTube TV said it would drop its monthly subscription price to
$49.99 from $64.99 as long as the channels are unavailable.

196.    YouTube TV's announced price reduction and ESPN-less base bundle represented a
massive threat to Disney. The threat, however, was also clear evidence that streaming live TV prices were
being inflated by carriage agreements mandating that ESPN be included in streaming live TV base
bundles—a price inflation that Disney had fought tooth-and-nail to maintain.

197.    On December 19, 2021, Disney and Google reached a new carriage agreement, and Disney
restored access to ESPN for YouTube TV subscribers. YouTube TV had, in the interim, issued a $15
credit to its subscribers—the precise amount they were being overcharged due to Disney's carriage terms
requiring the base bundling of ESPN. As Investopedia reported:

The brief disruption of Disney networks turned out to be profitable for
YouTube TV subscribers. YouTube TV had said that it was reducing its
fees from $64.99 to $49.99 and applied the change as a $15 credit in the
next billing cycle to some YouTube TV subscribers. The company said that
it would maintain the credit for this month for the affected members.

198.    Although the companies did not publicly disclose the terms of their new deal, the principal
contention had centered around MFN terms:

The two sides were in negotiations to hash out an agreement over Disney
content that includes 17 live channels and eight television stations.
YouTube claimed that Disney was demanding more money for its

programming than what other platforms, which are similar in size to YouTube, pay for it. The contractual clause is known as the Most Favored Nation (MFN) clause and requires Disney to match its carriage rates across the board for services of similar size. Disney resisted the change, countering that YouTube was declining to reach a "fair deal" based on "market terms and conditions." The companies did not disclose the terms of the new deal.

199.   After Disney and Google reached a deal in December 2021, YouTube TV did not lower prices in future months. It did not offer an ESPN-less base package. Disney had apparently maintained its ability to require ESPN on every available streaming live TV base package, and YouTube TV had received some protections that Disney's Hulu + Live TV would not undercut its base package price and terms.

### D.   Disney Captures Sling TV with a New Carriage Agreement

200.   By 2022, Disney had captured its major streaming live TV rivals, including Google's YouTube TV and AT&T/DirecTV's streaming live TV product (now called DirecTV Stream), with onerous carriage agreements that required that ESPN be carried as part of base streaming live TV bundles and that ensured a price floor through MFN clauses. As a result, Disney was able to supracompetitively hike prices across the entire United States streaming live pay TV market simply by tuning the prices of its own products: ESPN and Hulu + Live TV.

201.   However, as of mid-2022, one major streaming live TV service remained outside of the Disney's web of horizontal carriage agreements—Sling TV, which was owned by Dish.

202.   Sling TV was one of the earliest streaming live TV services to carry ESPN, and accordingly, had entered into agreements with Disney before it acquired control over Sling TV's direct competitor, Hulu + Live TV.

203.   This legacy agreement between Disney and Sling TV—made before Disney became a horizontal competitor—was less onerous than later carriage agreements Disney demanded (and obtained) from the major streaming live TV services.

204.   In particular, as with the other carriage agreements Disney made with streaming live TV providers, Disney's legacy carriage agreement with Dish required that Sling TV include ESPN as part of

its base bundle, however Disney had not foisted its recent iteration of MFN agreements on Sling TV. As a result, as of 2022, Sling TV's prices (for a service that was in some respects an outlier among streaming live TV products, as it was notably less complete contentwise than leading streaming live TV services) were significantly lower than its major rivals YouTube TV, Hulu + Live TV, and DirecTV Stream, all of which had base bundle prices that were by this point essentially equal to traditional cable/satellite TV base bundles thanks to Disney's latest web of carriage agreements.

205.    This represented a problem for Disney, which was using its own cost inputs and contracts with streaming live TV providers to hike prices across that market toward parity with cable/satellite, thus maintaining the price premium Disney had long enjoyed from its "ESPN tax" in the face of an entirely new, quickly growing alternative to traditional cable/satellite pay TV. Sling TV was the last major streaming live TV rival that had a legacy carriage agreement with Disney; bringing it into the fold with Disney's current requirements would bring the entire streaming live TV market within Disney's complete price-raising grasp.

206.    In short, Disney needed to have a more direct input into Sling TV's costs through more onerous carriage requirements in order to maintain a true market-wide price floor among streaming live TV services. In the fall of 2022, Disney finally had the opportunity to do so using ESPN as leverage, as Disney's carriage agreement with Dish and Sling TV finally approached expiration expired.

207.    On October 1, 2022, Disney's legacy carriage agreement with Dish and Sling TV expired, and Disney's familiar hardball negotiations began, including a demand for a $1 billion fee hike. At the very moment of agreement expiration, Disney cut Sling TV and Dish subscribers' access to ESPN and other Disney-controlled channels.

208.    That same day, Dish put out a press release, titled "The Walt Disney Company Forces Channel Blackout for Millions of DISH TV and SLING TV Customers":

> The Walt Disney Company today forced a channel blackout on DISH TV and SLING TV, affecting favorites such as ESPN, FX, Disney Channel, Freeform and National Geographic, as well as ABC locals in eight markets. The media conglomerate declined DISH's offer for a contract extension, walked away from the negotiation table and refused to keep its

programming accessible for millions of DISH and SLING customers across the United States.

209.    Dish accused Disney of outright anticompetitive conduct:

> "Disney has exploited its market position to increase fees without regard for the public viewing experience," said Brian Neylon, executive vice president and group president, DISH TV. "Clearly, Disney insists on prioritizing greed above American viewers, especially sports fans and families with children who watch their content."

> As one of the nation's largest media conglomerates, Disney is more interested in becoming a monopolistic power than providing its programming to viewers under fair terms.

210.    Disney's response in the press was eerily identical in substance as what it had said during negotiations with AT&T and Google over their respective streaming live TV services. As a Disney spokesman told the press:

> The rates and terms we are seeking reflect the marketplace and have been the foundation for numerous successful deals with pay TV providers of all types and sizes across the country. We're committed to reaching a fair resolution, and we urge Dish to work with us in order to minimize the disruption to their customers.

211.    Disney was clear—it wanted to impose the same sort of carriage agreement it had forced on Google's YouTube TV and AT&T's DirecTV Stream. As Forbes reported, the sticking point was again a "most favored nation" clause:

> It is extremely rare for a channel to go dark—typically extensions are given for several days or even a week so that the economics can be agreed upon. However, it is very challenging for a major owner of cable networks to budge on price given what are called Most Favored nation (MFN's) contracts that are in carriage agreements with other major cable and satellite operators.

> MFN's state that if an operator like DISH is given a lower price than another operator of similar size, the cable network owner must pass this new discounted price onto these other multichannel systems that have the same size subscriber base.

212.    Because Disney had obtained MFNs from Google (YouTube TV) and AT&T (DirecTV Stream) and could set minimum prices, including with its Hulu + Live TV product, it was positioned to

force a massive price increase on Sling TV. But Disney could not impose its price floor on the last remaining major player in the market without a long-term MFN agreement.

213.    By October 3, 2022, Disney and Sling TV reached a "handshake deal" on a new carriage agreement. As The Verge reported:

> Dish and Disney have reached a "handshake deal" to immediately bring Disney's collection of cable networks back to Dish satellite and Sling TV customers. The two companies confirmed the agreement late on Sunday night. "We are pleased to restore our portfolio of networks on a temporary basis while both parties work to finalize a new deal," Disney said in a statement.

214.     Dish tweeted to its customers that ESPN and other Disney-controlled channels had been restored.



215.    Disney had now captured every significant player in the streaming live pay TV market with MFN agreements—all requiring ESPN be sold as part of the base package offered. In short, Disney now had control over the very "marketplace" terms it claimed to be seeking in its negotiations. And Disney—which owned and controlled market participant Hulu + Live TV—controlled a direct, substantial cost input into its horizontal competitors through those same agreements.

216.     On November 4, 2022, Dish increased the price of its base Sling TV packages by $5, with its base plan costing $40 and its most expensive package, with a comparable set of channels to other streaming live pay TV competitors like YouTube TV, Hulu + Live TV, and DirecTV Stream, costing $55.

217.     Unsurprisingly, after reaching a new ESPN deal with Disney, Sling TV's President Gary Schanman told the press that Sling TV had increased prices because the "price of programming continues to rise." Schanman emphasized that Sling TV had not raised prices in "nearly two years."

218.     The new carriage agreement with Disney had clearly moved up the price of the cheapest SLPTV product in the market, setting a new price floor. Sling TV, which had launched with a $20 plan, now cost as much as $55.

**E.     Streaming Live TV Prices Rise in Lockstep after Disney's Web of MFN Agreements**

219.     Since Disney reached new carriage agreements with its major streaming live TV competitors, including AT&T/DirecTV (DirectTV Stream) and Google (YouTube TV), the price of basic streaming live TV packages across the market, including the base bundles from market leaders YouTube TV, Hulu + Live TV, and DirecTV Stream, has risen substantially in a short period of time, settling at prices nearly at parity with basic cable packages from traditional satellite and cable TV providers. This despite the fact that Internet live video streaming technology improved significantly over this same period (technology improvement/maturity is generally often associated with a price *decrease* in related consumer technology products and services).

220.     In the three-year period since Disney—owner of the most significant price input, ESPN— took over control of a leading market participant, Hulu, prices have charged up by about 35%, to reach the point of near-indifference with the long-maligned $65-70 per month price of basic cable/satellite pay TV. Between 2019, when Disney took over Hulu, and 2022, when Disney reached new carriage agreements with its last major streaming live pay TV rivals, the price gap between base packages for cable/satellite TV and streaming live TV narrowed from $15-35 per month, per subscriber, to almost nil.

221.    Meanwhile, YouTube TV has become the number one streaming live TV provider, followed closely by Hulu + Live TV. As TechCrunch reported on July 12, 2022:

> YouTube's Chief Product Officer Neal Mohan confirmed today a new milestone for YouTube's live TV streaming service, YouTube TV. Speaking on a panel at Fortune's Brainstorm Tech conference, the exec said the service has now surpassed 5 million paid subscribers and "trialers" in just five years, he said. This figure initially seems to position the streamer ahead of its nearest rival, Hulu + Live TV, which now has 4.1 million subscribers as of April 2022.

222.    Since Disney took over control of Hulu in mid-2019, Hulu + Live TV and YouTube TV have become the top two streaming live TV providers by a wide margin, with approximately 70% of all streaming live TV subscribers in the United States. Notably, all of their subscribers are forced to pay the ESPN tax—as are subscribers to their closest rivals, Sling TV and DirecTV Stream. There are no ESPN-less options available at a lower price.

223.    Both YouTube TV and Hulu + Live TV charge roughly the same amount of money for their services. YouTube TV's base package costs $64.99 per month, and Hulu + Live TV, $69.99, with both services reaching prices well above $70 when additional options are added, such as 4K quality broadcasts. Prices have now reached the same $70 base subscription level that cable and satellite TV was charging on average in 2013—when Disney was able to passively extract a tax for ESPN from cable subscribers throughout the United States.

224.    To date, not a single price increase by YouTube TV or Hulu + Live has been met with any price competition. Not a single rival service, such as DirecTV Stream, has lowered prices. To the contrary, DirecTV Stream's base plan, which also forces ESPN on subscribers, begins at $69.99.

225.    This uniform price parity with no price competition is not a coincidence. As explained below, it is a direct consequence of two aspects of the carriage agreements Disney has forced on streaming live TV providers: First, ESPN must be bundled in base plans, and second, because Disney controls Hulu + Live TV, Disney can and does force a functional price on the market through its MFN clauses. In other words, if Disney raises Hulu + Live TV prices, it can raise MFN terms up to that price point. And, because

Disney's carriage agreements prevent ESPN-less bundles, Disney maintains a direct cost input to its competitors' base package prices.

## VI. THE RELEVANT MARKET

226. The relevant market is the Streaming Live Pay TV Market (the "SLPTV Market"). The SLPTV Market is a distinct sub-market of the Live Pay TV Market ("the "LPTV Market"), which includes cable and satellite television providers. Providers of live television in the LPTV market are referred to in the industry as Multichannel Video Programming Distributors ("MVPDs") and providers in the SLPTV submarket are referred to as Virtual Multichannel Video Programming Distributors ("vMVPDs").

227. The SLPTV Market includes subscription-based services that provide access to live television channels over a broadband internet connection. The SLPTV products are provided as bundles of channels.

228. SLPTV providers generally create a "base" or "basic" package of channels, which is the minimum number of channels a subscriber must purchase access to as part of a subscription. SLPTV providers do not allow subscribers to choose individual channels to include in subscriptions.

229. Although packages are typical in the market, they are not necessary for the pay TV product. Indeed, early "slim bundles" provided by traditional cable providers, such as Verizon Fios, allowed *a la carte* selection of bundled channels, but Disney prevented such offerings by enforcing contractual provisions preventing de-bundling of certain channels.

230. SLPTV products appeal to subscribers not only because they provide live television services without the need to subscribe to a cable or satellite television plan, but because SLPTV products are generally available on multiple devices, including tablets, smart phones, PCs, laptops, televisions, and game consoles. SLPTV subscriptions are also available without the long-term contracts forced on cable and satellite television subscribers.

### A. The SLPTV Market Is a Distinct Submarket

231. The SLPTV Market is a distinct submarket of the LPTV Market. Several relevant factors indicate that the SLPTV Market is distinct from other markets, including the LPTV Market.

232. ***Industry and public sources recognize the SLPTV submarket as a separate economic entity, and the SLPTV product has peculiar characteristics and uses.*** Live television providers over the Internet are widely recognized as providing services to a separate and distinct submarket. Providers in this market are referred to by industry sources as Virtual Multichannel Video Programming Distributors (vMVPDs) rather than Multichannel Video Programming Distributors (MVPDs).

233. The industry and public view the two markets as separate because unlike MVPDs, which provide their own transmission infrastructure, including a local network connection and set top box to provide television services, vMVPDs provide access to live television without providing separate transmission infrastructure, relying on existing broadband Internet connections and various Internet-connected home devices (*e.g.*, smart phones and smart TVs) to provide services.

234. Industry participants, such as The Wrap and Comscore, refer to products provided by vMVPDs as in a distinct market, with separately measured market shares and distinctly identified market participants. As The Wrap explained in 2019:

> Virtual multichannel video programming distributors (vMVPD)—also referred to as streaming TV services—aggregate live and on-demand TV and deliver the content over the internet in a linear fashion. vMVPD services resemble the familiar layout of cable packages where users can browse a guide or flip through channels that stream programming 24 hours a day. These services are often used by recent cord-cutters who want to keep select channels from their cable packages but at a lower price.
>
> vMVPD services include, Sling TV, Hulu Live TV, YouTube TV, DirecTV Now, fuboTV, PlayStation Vue, Viacom's Pluto TV and Xumo. According to Rich Greenfield of BTIG, paid vMVPD subscribers hit a high of 7.7 million last year.

235. Industry analysis routinely regard SLPTV products provided by vMVPDs as distinct products with "slimmer" entry or base bundles, allowing pricing and offerings not available in the LPTV Market.

236. Indeed, as Lifewire explained in a November 2022 post, both LPTV and SLPTV Market products provide live television, but SLPTV products provide more flexible offerings:

> While both cable television and video streaming services provide the same result (entertaining video on your screen), the way they do so is

significantly different. Cable providers broadcast video content along their dedicated networks, and have long-standing relationships with content providers. The pay television industry was built on this structure, and the product you receive reflects that. Cable television is typically more reliable and provides more content, at the (literal) cost of being more expensive.

Streaming providers on the other hand are newcomers to the video market, and aren't bound by the same rules. They can offer their services nationwide, and you can use their services with a variety of devices. They aren't bound to legacy infrastructure, which is both a blessing and a curse. They can deliver over any Internet connection, but they are also completely dependent on that connection, and don't have any control over its quality. They typically offer cheaper plans, although they contain fewer channels.

237. Because SLPTV products do not force a distribution infrastructure on the purchaser, they are associated with independence from oppressive, legacy hardware that has long been forced on traditional cable and satellite TV subscribers, such as set-top boxes and unsightly satellite dishes.



238. Because cable TV providers control the infrastructure used to transmit television channels, they are able to—and do—force subscribers to lease outdated, proprietary cable/set-top boxes (*e.g.*, the one pictured above) from them for use as receivers/decoders to connect specific televisions. Cable providers often charge per box or per television for services.

239. Many cable companies notoriously force set-top boxes on subscribers that are egregiously outdated, produce massive amounts of heat, connect with unsightly cabling, and consume large amounts of electricity.

240. As VentureBeat reported in August 2018, DVR set-top boxes are highly wasteful, often with power saving features that do nothing:

> In testing conducted by our team at Sense, we discovered that DVRs from the leading pay TV providers have a "power save" mode that effectively does nothing. Our energy testing on the Comcast flagship Xfinity X1 DVR found that turning on power save mode reduced power use from 26 watts to 24.5 watts. A tiny savings of only 1.5 watts—probably all coming from turning off the light that tells you it's on! Tests of DVRs from Time Warner, DirectTV, and Verizon also showed these had no useful power saving mode either.

241. Customers have no choice but to use these set-top boxes. They are forced on customers of cable and satellite TV services, and most services force subscribers to pay monthly for the privilege. Additionally, these forced set-top boxes extract significant amounts of energy expenditures from consumers every year. As VentureBeat explained:

> Overall, DVRs and set-top boxes used something like 21 TWh in 2017. Rolling out two-thirds savings based on implementing a real power saving mode in existing designs would save more than 14 TWh of energy—over 1 percent of all US residential usage. This would save US consumers $1.84 billion per year and avoid carbon emissions equivalent to almost five coal-fired power plants. Going all the way to the potential 90 percent savings by making use of existing mobile device technologies would save consumers almost $2.5 billion per year and would avoid emissions equivalent to more than six coal-fired power plants.

242. SLPTV products, however, do not require distinct hardware to receive live television channels. The live television programming in SLPTV products is transmitted over a subscriber's existing Internet connection, and displayed through a subscriber-owned Internet-connected device—*e.g.*, a smart television, a tablet, or even a smartphone. Smart televisions, for example, can display live TV channels by directly streaming them over an Internet connection, and do not have to be connected to a provider-owned cable box or other set-top hardware.

243. Cable and satellite TV subscribers have no choice in the hardware they use to receive television channels. SLPTV subscribers, however, can use devices with cutting edge power consumption profiles, including laptops, PCs, game consoles, smart TVs, tablets, and smartphones. Unlike cable and satellite TV consumers, whose providers that have no incentive to innovate as to the quality of set-top boxes, SLPTV subscribers can use live TV reception and display products developed in highly competitive markets. Moreover, SLPTV subscribers can choose what products they use to receive live TV transmission and can upgrade (or not) as they see fit.

244. Likewise, SLPTV products are viewed as distinct from satellite TV products because they do not require permanent installation of hardware, namely, a digital satellite dish mounted on a person's physical residence, such as the one pictured below.



245. Unlike satellite-based infrastructure, SLPTV access is not limited to the physical location of a satellite dish, and no location-based device calibration is required.

246. In addition, service changes and cancellations are regarded as easier to accomplish in the SLPTV Market than in the LPTV Market, where cable and satellite TV providers require expensive, proprietary hardware and long-term contracts. First, there is no sunk cost from proprietary hardware

purchases in the SLPTV Market. Second, there are no long-term contracts forced on SLPTV subscribers. Relatedly, channel lineup changes are virtually instant in the SLPTV Market.

247.    Pricing is also transparent in the SLPTV Market. Unlike cable and satellite pricing, which often includes one-year discounts or introductory rates, SLPTV subscriptions include a plainly disclosed channel lineup and monthly price. Price changes are generally uniformly applied.

248.    SLPTV Market products are also unbound from subscriptions for other, non-TV products. Services are provided "Over the Top," or OTT, meaning they provide access to online content over a broadband connection without the need for a cable, wireless phone, or satellite TV subscription.

249.    The industry press refers to the SLPTV market as distinct from the LPTV market, often referring to the former as the vMVPD market and the latter as the MVPD market.

250.    For example, market intelligence company Parks Associates describes the vMVPD market as distinct from traditional MVPD-based markets:

> **Virtual Multichannel Video Distributors (vMVPDs):** These are separate from traditional pay-TV, and a subset of online pay-TV and offer over-the-top subscriptions for bundles of live, linear channels of professionally produced content. What makes these services distinct from other online pay-TV offerings is that they are available to consumers at large—subject to content licensing agreements—and are not restricted to a company's existing broadband or other subscribers. vMVPDs often include access to the users' major local television stations as part of the subscription package.

(boldface in original)

251.    The FCC does not apply the same rules to vMVPDs as to MVPDs. In other words, regulators view the vMVPDs in the SLPTV market as providing a distinct product in a distinct submarket. For example, the Communications Act requires MVPDs to follow "retransmission consent" rules and may require them to carry signals on fair bases, including under the so-called "must-carry" rule. None of these rules apply to vMVPDs. Other rules are also considered by regulators and lawmakers to be inapplicable to vMVPDs, including rules regarding political advertising and emergency services.

252.    MVPDs themselves recognize the regulatory differences between their products and vMPVDs in the SLPTV Market, including with regard to constraints on carriage negotiations. In an April

21, 2022, letter to the FCC by affiliates of the four largest television networks, the affiliates complained

about the effect of the FCC's rules on contract negotiations and on the affiliates' businesses:

> However, MVPDs are not subject to the transmission consent rules. Unlike negotiations with traditional MVPDs where local television Affiliates negotiate directly for the carriage of their FCC-licensed signals, the national Big Four broadcast networks have asserted near-total control over carriage negotiations with vMVPDs. Time and again, the Four Affiliates Associations representatives explained, a Big Four network (or more accurately, its parent entity) will fully negotiate an agreement with a given vMVPD for carriage of network-owned stations as well as networked-owned cable channels and other less popular programming—without any meaningful input from its non-owned Affiliate stations. After such an agreement is all-but finalized, the Big Four network will present the agreement to its local Affiliated stations in what generally amounts to a "take it or leave it" deal that the Affiliate must accept if it is to be carried on the virtual MVPD at issue.

> Because the Commission's retransmission consent rules do not currently apply to vMVPDs, the Big Four networks control negotiations with virtual MVPDs. The Affiliated stations are at the mercy of agreements that they have no say in negotiating. The December 2021 impasse between YouTube TV and ABC/Disney illustrates one of the many problems with the current framework: all ABC-Affiliated stations nationwide were simultaneously removed from YouTube TV during the impasse, and local Affiliates had no insight into the YouTube TV/Disney negotiations, including if or when their signals and local content would be restored to YouTube TV subscribers. The Four Affiliates Associations representatives explained that local stations must be able to negotiate directly with virtual MVPDs (as they do with traditional MVPDs under the retransmission consent rules) in order to negotiate a fair compensation and non-economic terms reflective of the true value of their local programming, which they could then reinvest in the production and distribution of local news and other local programing.

> The Four Affiliates Associations also noted that until vMVPDs are defined as MVPDs, the vMVPDs are not required to adhere to the numerous Commission rules designed to protect viewers. For example, vMVPDs are not subject to the Commission's rules on accessibility, emergency programming, EAS, or equal employment opportunities. By expanding the definition of MVPD to include vMVPDs, the Commission would ensure that viewers who increasingly turn to online sources have the same access to closed captions, emergency alerts, and the numerous other services that viewers rely on when watching the same programming from traditional MVPDs.

253.     In other words, industry participants and regulators view vMVPDs as distinct, meaning that they provide distinct products in the SLPTV Market and are able to provide services without the same regulatory constraints imposed on MVPDs. The products in the SLPTV Market are widely recognized as having peculiar characteristics and uses.

254.     ***Unique production facilities.*** SLPTV services are provided using data centers, which host live streams of data sent over broadband connections to subscribers. YouTube TV, for example, utilizes Google's cloud-based servers to store video that is re-transmitted as part of its streaming product.

255.     SLPTVs must take a source live transmission and convert it to streams to be sent to subscribers. Because the stream is broadcasting live television, the streams must have low "latency," meaning that the data stream cannot cause a significant delay in the broadcast as it traverses the Internet to customers. Indeed, significant latency could result in sports games being broadcast seconds later than on conventional live television, which would undermine the live viewing experience in SLPTV products.

256.     As such, vMVPDs in the SLPTV Market must invest in purpose-built distribution infrastructure, ensuring (among other things) there are content servers physically close to subscribers in order to minimize latency. SLPTVs must also ensure their products have bandwidth sufficient to reliably and effectively serve a clean, clear audiovisual stream to their customer base, particularly at times when many customers simultaneously make bandwidth demands—a technical constraint particularly unique to *live* Internet-streamed TV, which must work seamlessly during popular live sports games, watercooler events like the Oscars, and the like.

257.     Slow streams or repeated buffering frustrates the live television experience, undermining the SLPTV product as a viable alternate source of live television. As such, SLPTVs must repeatedly test streams on various ISPs' networks throughout the country, including at many major locations throughout the country.

258.     Moreover, because SLPTV products are not bound to infrastructure controlled by the vMVPD providing the service, the vMVPD must perform quality control checks on various forms of hardware, operating systems, bandwidth profiles, and under various (and sometimes volatile) bandwidth demands.

259. Further, because vMVPDs do not control the transmission infrastructure they use, they cannot control outages caused by other factors, such as a local ISP problems. As such, vMVPDs must provide distinct contractual terms and support services in service of their SLPTV products.

260. Cable and satellite providers control the transmission infrastructure and therefore do not need to make these same (or similar) sorts of investments.

261. ***Distinct customers/consumers.*** SLPTV consumers are distinct from the general pool of LPTV consumers.

262. First, SLPTV consumers tend to be younger. As Pew Research found as early as September 2017, streaming television consumers skew significantly younger, with approximately 61% of 18 to 29 year-olds then consuming TV through streaming services rather than traditional cable television.  By contrast, 84% of television viewers older than 65 subscribed to cable or satellite television, and 70% of viewers between 50 and 64.

263. As NScreen Media explained in April 2020:

> According to new research from Leichtman Research, vMVPD subscribers skew much younger than traditional MVPDs. Two-thirds of vMVPD subscribers are in the age range of 18 to 44 years. 18% of adults in the 18-44s have a vMVPD service, while only 9% of these over 44 years old have one.

264. SLPTV viewers also consume less video using a television. Many opt for smaller, hand-held devices, including tablets (*e.g.,* iPads), smartphones, or laptops. By contrast, LPTV subscribers consume television content using a traditional television or smart television that is stationary or centrally located in their house.

265. SLPTV consumers are likely recent converts from traditional cable television products—so-called cord cutters. Per NScreen Media:

> Most people with a vMVPD service switched directly from a cable, satellite, or telcoTV service, according to Leichtman. 44% said they switched from a traditional pay TV provider, and 26% said they had both MVPD and vMVPD. 18% switched from another vMVPD, and 12% didn't have a live TV provider before they subscribed to a vMVPD.

266.    Others SLPTV customers have switched from other vMVPDs, or subscribe to both LPTV and SLPTV products.



267.    ***Distinct prices and sensitivity to price changes.*** Prices in the SLPTV Market are, and have historically been, distinct from prices in the LPTV market. Indeed, one significant draw towards the SLPTV market for American consumers is avoidance of high cable and satellite TV bundle costs.

268.    SLPTV Market prices are distinct in three important respects.

269.    First, because SLPTV bundles have historically excluded many of the channels forced on LPTV subscribers, prices for base bundles are lower. During the class period, prices were at times less than half an average basic cable television package.

270.    Disney's anticompetitive conduct has inflated prices, pushing them closer to the average monthly cost of a satellite television or cable television package, but even so, SLPTV prices remain lower than those charged by cable and satellite TV providers, particularly accounting for lease or sale of proprietary cable/set-top box or dish hardware required for cable and satellite TV products.

271.    Second, SLPTV price changes are not sensitive to price changes for traditional cable or satellite TV plans. SLPTV prices, including from YouTube TV, Hulu + Live TV, Sling TV and others do not vary with bundle discounts, introductory rates, increased fees and taxes, and other charges imposed by traditional cable TV and satellite TV providers.

272.     Third, SLPTV prices remain uniform throughout the United States. Cable and satellite TV providers, however, impose different prices throughout the United States. In many cases, a cable company may be the only provider available in a geographic subregion, allowing the company to charge higher prices. Because broadband Internet access is now largely ubiquitous, SLPTV providers compete nationally on prices and advertise a single, uniform price on their websites.

273.     Finally, SLPTV services are not sold as part of long-term contracts. YouTube TV, Hulu + Live TV, Sling TV, and DirecTV Stream all provide monthly subscription options that can be cancelled without paying a penalty. Cable and satellite television providers, however, often impose cancellation penalties for breaking long-term contracts. Moreover, in the LPTV market, one- or two-year contracts or price agreements are common. These are absent in the SLPTV market.

274.     SLPTV prices do not include forced rentals of set-top boxes or other proprietary hardware. The price of these boxes/hardware further differentiates traditional LPTV products from those sold in the SLPTV market.

275.     ***Specialized vendors.*** Because SLPTV providers do not require the rental of set-top boxes and are often device-agnostic as to the consumer, digital video recording services are provided as a cloud service. Cloud-based DVR services are specialized, and tailored to vMVPD products. They are often developed by the vMVPD itself, but rely on and/or use cloud-based products from major cloud computing vendors, such as Google Cloud or Amazon Web Services.

## B.     Market Participants and Market Concentration

276.     During the Class Period, the following companies/product brands provided and/or provide live television services over the Internet as vMVPDs: YouTube TV (Google), Hulu + Live TV (Disney), DirecTV Stream (AT&T, previously branded DirecTV Now and AT&T Now), Sling TV (Dish), and Fubo TV.

277.     As of the filing of the complaint, YouTube TV is the largest SLPTV service with approximately 5,000,000 subscribers, and Hulu + Live TV, which is owned and operated by Disney, with approximately 4,100,000 subscribers. The subscriber shares are depicted below:



278.    Because prices for base packages are largely in parity—indeed, in near-lockstep as of the filing of this Complaint, for all leading SLPTV services—revenue shares are distributed in approximately the same proportion.

279.    The SLPTV Market is highly concentrated. The Herfindahl-Hirschman Index (HHI) of the market shares above, a commonly accepted measure of market concentration, is 2794.

280.    The United States Department of Justice, according to its Horizontal Merger Guidelines, considers HHIs between 1,500 and 2,500 to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points to be highly concentrated. The SLPTV Market, with an HHI of 2794 based on the above market shares, is therefore highly concentrated per the DOJ's guidelines.

**C.    The Relevant Geographic Market**

281.    The relevant geographic market for the SLPTV Market is the United States.

282.    Unlike MVPDs, vMVPDs do not provide television programming through cable TV or satellite infrastructure. vMVPDs provide content over broadband Internet connections, which are available throughout the United States.

283.    In addition, programming can be transmitted to customers in the SLPTV market through any Internet connection, even an LTE or 5G cellular Internet connection. Such connections are available throughout the United States through ubiquitous cellular providers.

284.    The SLPTV Market, however, does not extend globally because of extensive network licensing agreements that prevent transmission of live television content outside of the United States. Moreover, because over-the-air live networks broadcast in the SLPTV Market are governed by Federal law, content restrictions, including time, place, and manner restrictions, are tailored to the laws of the United States.

285.    Finally, the bundles of channels sold in the SLPTV market generally cater to United States consumers, including because the content provided in SLPTV bundles is predominantly in English and Spanish and produced in and for United States viewers.

286.    To the extent SLPTV channels are advertising-supported, such as with network television, advertisers promote products and services tailored to United States audiences, through commercials tailored for United States audiences.

287.    For at least the foregoing reasons, an SLPTV bundle sold and provided to U.S. customers is not reasonably interchangeable with streaming live television products sold in other countries. Indeed, in certain countries, channels bundled as part of SLPTV Market are banned by applicable laws.

288.    vMVPDs generally enforce U.S. territorial restrictions by obtaining geolocation information from subscribers at authentication, with a denial of access to content outside of licensed regions.

289.    In sum, the SLPTV Market spans the entire United States because Internet access is widely available throughout the geographic territory. Due to content, licensing, and regulatory restrictions, however, SLPTV Market products do not compete in markets outside of the United States.

### D.    The Carriage and Streaming Infrastructure Barrier to Entry

290.    The SLPTV market is protected by a powerful barrier to entry that arises from carriage agreements and video streaming infrastructure, referred to in this Complaint as the Carriage and Streaming Infrastructure Barrier to Entry ("CSIBE").

291.   To begin with, providing live streaming television requires extensive infrastructure, particularly servers capable of processing high resolution video and serving it with minimal latency, and bandwidth sufficient to deliver the video to customers over the Internet.

292.   High resolution video is computationally intensive, requiring servers with significant computing power. It is not sufficient to use a server that can process other Internet traffic, such as web servers.

293.   Servers capable of serving high resolution video are more costly. One reason for this is that streaming video is transmitted using data compression, a computationally intensive process that reduces the amount of data that must be transmitted over the Internet. Compression also reduces the storage space needed to maintain a streaming buffer of high-resolution video as well as recordings of live video, including for cloud DVR products.

294.   Servers are often interconnected using a content delivery network ("CDN"), which together provides cache and allows for transmission from several geographic locations at once. The ability to geographically distribute content servers (sometimes called "edge" servers) is necessary to ensure that servers physically close to a customer serve content data. Ensuring server locality reduces latency—the time delay it takes for video to arrive at its streaming destination. Conquering latency is incredibly and peculiarly important for live streaming video products.

295.   Companies like Alphabet, which owns Google and YouTube, develop custom file systems to optimize streaming. For example, Google developed Google File System for YouTube to manage large-scale data in a distributed environment. Likewise, Google developed BigTable to provide a low-latency distributed data storage system built on GFS in order to deal with petabyte-scale data spread across thousands of machines.

296.   To credibly enter the SLPTV market, a company must traverse the CSIBE not only by obtaining computing power, distributed computing systems, large amounts of data storage, and local data servers, but also by developing custom file systems and software infrastructure to optimize streams.

297.   YouTube's extensive streaming video infrastructure allowed YouTube TV to quickly enter the SLPTV market at scale. Likewise, Hulu, which had been streaming video for years prior to

entering into the live television business, was able to leverage its streaming infrastructure to provide its Hulu + Live TV product.

298.    New entrants without pre-existing streaming infrastructure will have to acquire computing power, data storage, and software infrastructure that can operate at scale. Otherwise, the product will not meet baseline criteria, such as low latency, high resolution, and robust streaming.

299.    To date, there has not been any at-scale entry into the SLPTV Market by a company that did not already have some pre-existing video streaming infrastructure. Indeed, the infrastructure necessary to provide live television at scale across the United States is cost-prohibitive to build from scratch. Moreover, because companies like Google control cloud computing power and have developed customized file systems and other services to support live streaming from the cloud, a new entrant could have to purchase computing time and bandwidth from YouTube TV's parent—a direct competitor—in order to enter the SLPTV Market at scale. YouTube TV can (and likely does) obtain those resources at cost, if not lower. A new entrant cannot.

300.    Disney uses Amazon Web Services ("AWS") for its streaming systems. Its deployment of live TV on Hulu exploits its pre-existing streaming infrastructure on AWS. Indeed, Disney's Disney+ and Hulu streaming products rely on the same AWS-based systems.

301.    Given that Google Cloud and AWS have a stranglehold on United States video streaming infrastructure in the cloud, a new entrant to the SLPTV Market would have to purchase cloud computing resources in competition with Disney or YouTube/Google. Indeed, a new entrant would have to bid against these powerful incumbents for computing time on Google or Amazon's cloud servers, as pricing on those servers is dependent on demand.

302.    Successful entry also requires a series of carriage agreements with cable channel providers. An entrant must secure a critical mass of live television channels to become a viable pay television platform. Securing carriage agreements with major networks and with channel providers is costly, slow, and uncertain.

303.    For channels such as ABC, the Disney Channel, ESPN, FX, and others, an entrant would have to negotiate a carriage agreement with Disney—the parent of a direct SLPTV competitor who that

entrant would be seeking to unseat. Likewise, other channels, such as NBC, USA, CNBC, and MSNBC require negotiations with NBCUniversal, owned by an entrenched cable provider, Comcast. A failure to garner sufficient channels to provide a pay television experience renders a platform inviable as an SLPTV market participant. Moreover, a lack of *local* television channels can also prevent effective entry into the SLPTV market, resulting in an inability to obtain sufficient market share. Local channels are controlled by a confusing, difficult-to-navigate web of companies, with complicated (and occasionally divided) carriage and/or transmission rights that must be acquired.

304.  Disney's anticompetitive conduct with respect to its carriage agreements, particularly in connection with ESPN, has strengthened the CSIBE to prevent permissionless entry by a potential rival. Indeed, without making an actual carriage deal with Disney, a would-be entrant would lack several notable channels now available on every SLPTV platform, including ESPN.

305.  Together, YouTube, Disney, and other entrenched market leaders fortify the CSIBE by maintaining a stranglehold on scarce computing resources and infrastructure required for high resolution, low-latency streaming.

306.  Disney also maintains a web of carriage agreements with all market participants, including DirecTV Stream, requiring a new entrant to enter into an agreement with Disney to provide content available on other platforms in the SLPTV market. Disney thus maintains a cost input into each market participant's product, and can prevent or retard entry by mandating onerous terms or by outright refusing to license live television content.

## VII.  DISNEY'S AGREEMENTS WITH DIRECTV AND OTHER STREAMING TV PROVIDERS HARM COMPETITION IN THE STREAMING LIVE PAY TV MARKET

307.  Disney's anticompetitive carriage agreements harm competition in the SLPTV market by directly increasing prices; creating an effective price floor and/or preventing price competition; providing Disney a cost input into competitors' products; strengthening the CSIBE; and reducing consumer choice by forcing minimum base-packages on consumers that necessarily include Disney-controlled ESPN.

308.  The net result of this harm to competition has been consistent price increases, such that SLPTV offerings are now approaching traditional cable and satellite TV prices, closing the gap between

submarkets. This not only allows Disney to prevent cord-cutting, it allows it to continue to extract high affiliate fees from both vMVPDs and MVPDs, which were rapidly dropping prior to the commencement of Disney's anticompetitive conduct.

### A. Disney's Web of Carriage Agreements Force ESPN on Rivals and Consumers, which Has Allowed Disney to Raise Prices

309.    Based on market effects, Disney's most-favored-nation ("MFN") agreements appear to have two essential terms that allow Disney to anticompetitively raise and maintain prices.

310.    First, Disney's MFN Agreements with horizontal competitors, such as DirecTV Stream, appear to require that if an SLPTV service carries ESPN as part of any of its bundles, then that service must necessarily carry ESPN as part of the *base* or cheapest bundle it offers (the "ESPN Base Term"). This term restricts the ability of Disney's competitors to provide an option to customers to subscribe to an SLPTV product that omits cable's most expensive channel, ESPN, which Disney owns.

311.    This restores and fortifies the "sports subsidy" long forced on cable and satellite TV subscribers and ensures that regardless of whether a customer uses an SLPTV or LPTV product to view live television, they must pay Disney for ESPN.

312.    Absent the ESPN Base Term, Disney would not be able to prevent a horizontal competitor in the SLPTV Market from providing a "skinny" bundle, which would diminish the number of subscribers paying Disney per month for ESPN.

313.    There is clear evidence that Disney imposes the ESPN Base Term in its carriage agreements. To begin with, Disney has historically sued any MVPD provider that offered such a "skinny bundle," as it did Verizon when it first offered streaming-based base packages without ESPN. Moreover, in the SLPTV Market, there are no available packages from the market-leading SLPTV services— YouTube TV, Hulu + Live TV, or DirecTV Stream—that offer live television options without ESPN as part of the minimum-priced, base bundle.

314.    By entering into a series of carriage agreements with the ESPN Base Term, Disney ensures that customers have no option to opt out of ESPN—or the ESPN tax.

315.    Second, in addition to the ESPN term, Disney provides price restrictions in its MFN Agreements. As widely reported by the press, carriage agreement negotiations with Disney, including between Disney and DirecTV, have centered around an MFN price term that requires Disney to provide the counterparty with the lowest price for ESPN and other channels offered to any other market participant (the "MFN Price Term").

316.    Put simply, the MFN Price Term ensures that if Disney provides another service a lower price, then that price becomes the applicable price for its counterparty.

317.    Disney and DirecTV reportedly negotiated such a term before coming to an agreement in September 2019.

318.    Together, the ESPN Base Term and the MFN Price Term work together to ensure that Disney has direct control over competitor prices and, as explained in § VII.B, infra, Disney can maintain a price floor. Specifically, the ESPN Base Term ensures that no SLPTV Market participant offers a competitive ESPN-less product, and the MFN Price Term allows Disney to set the lowest price available for ESPN across the entire market (because there is no competitive ESPN-less product).

**B.    Disney Uses Hulu + Live TV to Set a Price Floor through Its MFNs' Price Terms**

319.    Because Disney operates a direct SLPTV market participant, Hulu + Live TV, as well as ESPN, Disney can control ESPN prices across the entire market. Although Disney's ESPN must be sold at the lowest price available to SLPTV Market participants, Disney controls one of the two largest providers, providing it a direct input into how prices for ESPN are calculated.

320.    For example, if Disney lowers its price on Hulu + Live TV by 10%, the MFN Price Term will require that other providers receive the same price. So long as Disney maintains a price floor using Hulu, it can set a price floor for the entire market, provided that other horizontal competitors must offer ESPN as part of their base packages.

321.    Horizontal competitors must pay the cost of ESPN set by Disney plus the other costs of their service. Disney, however, provides ESPN through Hulu at its own, far lower, cost.

322.    The net effect is that Disney, through ESPN and its carriage agreements, has a direct cost input into its horizontal competitors' offerings—the most expensive cost input. If Disney raises prices

through Hulu and negotiates carriage agreements setting ESPN prices below the Hulu price, it essentially sets a minimum price for SLPTV products in the market with those carriage agreements.

323.    The MFN Price Term is based on the price of ESPN offered to a market participant, not the cost at which Disney provides ESPN to its Hulu subsidiary. Thus, ESPN prices are cost increases for competitors, but the price increase to Disney's own subsidiary is illusory—a mere accounting fiction.

324.    Hulu + Live TV is currently priced several dollars above other comparable plans, and at parity with the base plan offered by DirecTV Stream.

325.    Since the negotiation of new carriage agreements in 2020 and 2021, every Hulu + Live TV price increase has been met with a corresponding price increase by competitors, including DirectTV Stream. Comparable base packages in the SLPTV Market have nearly doubled, currently starting at approximately $70 per month.

**C.    Disney's Carriage Agreements Allows It to Impose Costs on Competitors**

326.    ESPN is the largest cost for any SLPTV provider. It must pass that cost onto consumers as it increases. Thus, by increasing the cost of ESPN and forcing ESPN onto base bundles across the entire market, Disney is able to impose higher costs on rivals that it does not itself bear through its Hulu + Live TV product.

327.    Accordingly, an ESPN price increase from $9 to $10 per month would require a $1 price increase by Disney's competitors, as they would have to bear and pass on the cost. Disney and Hulu, on the other hand, experience no meaningful change to their true cost of providing ESPN. And indeed, Disney's profits from ESPN increase significantly as rivals' costs—and accordingly, prices offered to customers—increase.

328.    Disney's MFN Price Term coupled with its ESPN Base Term thus ensure that it can raise rival costs without meaningfully changing the cost at which it provides SLPTV services to just less than half of the market. It also ensures that Disney extracts higher monthly profits for ESPN from essentially all SLPTV subscribers, whether they want ESPN or not.

329.    Disney has done precisely this, increasing prices of horizontal competitors including DirecTV Stream, while maintaining the high monthly tax it charges all live TV providers for ESPN.

330.    Disney's price increases for ESPN, resulting in the imposition of higher (and disproportionate) costs on horizontal competitors, have directly harmed competition in the SLPTV Market by causing prices of base packages to rise across the entire market.

**D.    Disney's Carriage Agreements Strengthen the CSIBE by Requiring Content Negotiations with Disney to Effectively Participate in the Market**

331.    Because Disney conditions the ability to carry ESPN on accepting the ESPN Base Term, any rival that wants to carry ESPN as part of any bundle offered, must ensure its principal base bundle includes ESPN.

332.    Moreover, because ESPN is important to a large number of live television subscribers, a horizontal competitor or potential entrant must negotiate with Disney to remain competitive.

333.    Disney, however, also owns the second largest competitor in the SLPTV Market. Thus, if a competitor or new entrant wants to carry ESPN, it must essentially make a horizontal deal with a direct—and large—competitor in the SLPTV Market, and it must carry ESPN as part of its base or cheapest bundle.

334.    This strengthens the CSIBE because it ensures that a new entrant or competitor maintains a carriage agreement with Disney, which controls ESPN as well as Hulu + Live TV.

335.    In other words, Disney uses ESPN to ensure that all market participants must enter into what is essentially a horizontal agreement on price and on minimum bundles with one of the largest SLPTV participants—Hulu + Live TV. Disney does so under the guise of a carriage agreement with a separate Disney subsidiary, ESPN.

336.    These horizontal agreements harm competition in the SLPTV Market by allowing Disney to set and maintain market-wide prices and to impose costs on rivals that it does not bear.

**E.    Disney Harms Consumer Choice by Preventing Bundles without ESPN**

337.    The ESPN Base Term harms competition in the SLPTV market by reducing consumer choice marketwide.

338.     Because any rival that wishes to carry ESPN must do so pursuant to the requirements ESPN Base Term, there are no comparable products in the SLPTV Market without ESPN in the base bundle.

339.     All consumers must therefore pay for ESPN, whether they want it or not. Moreover, customers that left cable and satellite TV in favor of an SLPTV product in order to escape mandatory high-cost channels in their cable or satellite base package are faced with the same inefficient and unwanted product in the SLPTV Market.

340.     There are no procompetitive benefits to forcing customers to subscribe to ESPN as part of base packages. ESPN can be offered to only subscribers that want it as part of their SLPTV bundle, and there are no technological impediments to offering bundles without ESPN.

341.     Moreover, there is no procompetitive benefit to forcing customers who do not want to pay for ESPN to subsidize those who do.

342.     The anticompetitive effects, on the other hand, are clear. Users must buy services they do not want, and consumer choice is eliminated because ESPN-less base bundles are not meaningfully available in the SLPTV Market.

## CLASS ACTION ALLEGATIONS

343.     The class's claims all derive directly from a course of conduct by Disney. Disney has engaged in uniform and standardized conduct toward the class. It did not materially differentiate in its actions or inactions toward members of the class. The objective facts on these subjects are all the same for all class members. Within each Claim for Relief asserted by the class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action or on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rule of Civil Procedure 23.

344.     This action may be brought and properly maintained as a class action because the questions it presents are ones of a common or general interest, and of many persons, and also because the parties are numerous, and it is impracticable to bring them all before the court. Plaintiffs may sue for the benefit of all as representative parties pursuant to Federal Rule of Civil Procedure 23.

**The Class**

345.     Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and a class defined as follows:

> All persons, business associations, entities, and corporations who paid for a monthly subscription for DirecTV Stream or its predecessors DirecTV Now, AT&T Now, and/or AT&T TV Now, from the period beginning April 1, 2019, through the present (the "Class Period").

346.     Excluded from the nationwide class defined above is Disney, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**Numerosity and Ascertainability**

347.     The members of the class are so numerous that a joinder of all members would be impracticable. Indeed, there are currently about 800,000 DirecTV Stream subscribers that pay anticompetitively inflated subscription fees.

348.     The class is ascertainable. The class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications. Moreover, DirecTV Stream is in possession of all user contact information, including e-mail addresses.

349.     A well-defined community of interest in questions of law or fact involving and affecting all members of the class exist, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual class members. This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the class.

350.     The most significant questions of law and fact that will decide the litigation are questions common to the class, or to definable categories or subclass thereof, and can be answered by the trier of

fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common the Plaintiffs and class members, include, among others, the following:

    a.  Whether Disney and DirecTV Stream entered into a contract or conspiracy in restraint of trade;

    b.  Whether Disney's carriage agreement with DirecTV Stream is *per se* anticompetitive and unlawful, or in the alternative, whether it violates the rule of reason because the agreement lacks pro-competitive benefits or the anticompetitive effects of the agreement outweigh its pro-competitive benefits;

    c.  Whether Disney's carriage agreements with other SLPTV market participants are *per se* anticompetitive of unlawful, or in the alternative, whether they violate the rule of reason because the agreements lack pro-competitive benefits or the anticompetitive effects of the agreements outweigh their pro-competitive benefits;

    d.  Whether the members of the class are entitled to trebled damages, attorneys' fees, costs, and other monetary relief under the antitrust laws;

    e.  Whether the members of the class are entitled to injunctive relief allowing them to opt out of base bundles with ESPN and related Disney-controlled channels;

    f.  Whether Disney should be enjoined from entering into carriage agreements requiring ESPN and related channels to be included as part of base or minimum SLPTV bundles and packages;

    g.  Whether Disney has unlawfully and anticompetitively reinforced and strengthened the barriers to entry surrounding the SLPTV Market as a result of its web of anticompetitive carriage agreements, including through most-favored nation clauses.

    h.  Whether Disney's carriage agreements, including with DirecTV Stream, expressly or in effect, prevent the reduction of prices in the SLPTV Market.

**Typicality**

351.     Plaintiffs' claims are typical of the members of the class. The evidence and the legal theories regarding Disney's alleged wrongful conduct are substantially the same for Plaintiffs and all of the class members.

**Adequate Representation**

352.     Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs have retained competent counsel experienced in antitrust and class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class.

**Superiority**

353.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Disney has acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

354.     This action satisfies the requirements of Fed. R. Civ. P. 23(b) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact regarding Disney's conduct and responsibility predominate over any question affecting only individual class members.

355.     Because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individual, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

356.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each class member than would piecemeal litigation. Compared to the expense, burdens,

inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenge of managing this action as a class action is substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

357.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify and particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

## REALLEGATION AND INCORPORATION BY REFERENCE

358.    Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the class.

## CLAIMS FOR RELIEF

### Count I
### Section 1 of the Sherman Act (15 U.S.C. § 1)
(On behalf of the Nationwide Class)

359.    Disney, including through its Hulu, ABC, and ESPN subsidiaries, has entered into a web of horizontal agreements with direct competitors in the SLPTV Market, including DirecTV Stream and its predecessors, with the purpose and effect of raising prices and/or setting a price floor for streaming live pay television.

360.    Disney's agreements include anticompetitive terms in "carriage agreements," including most-favored-nation ("MFN") clauses that restrict price terms for ESPN and other Disney-controlled programming. Disney's carriage agreements also require that direct competitors in the SLPTV Market

include ESPN as part of their base or cheapest plan. Disney has entered into some variation of these agreements with every significant participant in the SLPTV Market, including YouTube TV (Google), DirecTV Stream (AT&T/DirecTV), and Sling TV (Dish).

361.    Disney's agreements, including its agreement with DirecTV Stream, are transactions in interstate commerce, as are the products it sells through its Hulu subsidiary, which are delivered using instrumentalities of interstate commerce, including Internet connections across state lines.

362.    Disney controls the second-largest competitor in the SLPTV, Hulu, which is considered the same entity as Disney for the purposes of Section 1 of the Sherman Act. Disney also controls ESPN, which is considered the same entity for the purposes of Section 1 of the Sherman Act.

363.    Because ESPN is the largest cost input for SLPTV products, Disney uses ESPN to maintain minimum prices, including through MFN clauses and the ESPN Base Term.

364.    Specifically, Disney's ESPN Base Term forces carriage agreement counter-parties, including DirecTV Stream, to carry ESPN as part of a minimum/base bundle provided to customers in the SLPTV Market. Disney also forces MFN agreements on carriage counterparties. These terms, together, allow Disney to set prices in the SLPTV Market.

365.    Moreover, because Disney controls both ESPN and Hulu, it can impose costs on SLPTV rivals without meaningfully increasing costs for its own SLPTV product. That is, although Hulu + Live TV is nominally charged for ESPN, Disney obtains all subscription fees it gleans from ESPN fees charged to Hulu. Moreover, by increasing the "price" charged to Hulu to carry ESPN, Disney sets prices for almost a third of the subscriptions sold in the SLPTV Market.

366.    The net effect is that Disney maintains horizontal agreements in the SLPTV Market as to prices. It can enforce these agreements market-wide through its web of carriage agreements, which require ESPN as part of an SLPTV provider's base bundle. Moreover, Disney can set market-wide ESPN fees with the price it charges for its own Hulu + Live TV product, including through operation of its MFN clauses affecting other SLPTV Market participants.

367.    Disney's agreements, including its agreement with DirecTV Stream, are together and individually *per se* violations of Section 1 of the Sherman Act. This is in part because the primary

objective of the agreements is to force a minimum price on the SLPTV market, and, in fact, because Disney has achieved that objective, essentially doubling prices in the SLPTV Market since acquiring control over SLPTV Market participant Hulu. Indeed, because Disney controls both ESPN, the largest cost input in the SLPTV Market, and Hulu, the market's second-largest competitor, its MFN clauses have exerted upward, not downward, pressure on prices.

368.   In the alternative, ESPN's agreements with SLPTV Market participants, including DirecTV Stream, are anticompetitive and unlawful under the Rule of Reason. As explained above, the agreements, including with DirecTV Stream, have resulted in a near-doubling of prices in the SLPTV Market—direct evidence of harm to competition in the SLPTV Market.

369.   The agreements have also resulted in other forms of harm to competition. For example, the MFN and ESPN Base Terms harm consumer choice by precluding competitive "skinny bundles" without ESPN.

370.   The MFNs also prevent Disney from lowering prices during carriage negotiations—as Disney would have to lower prices for all other counterparties if it lowered prices for anyone else—exerting upward pressure on prices. Indeed, Disney repeatedly pointed to so-called "marketplace" terms that Disney itself has effectively dictated through a historical web of agreements (and through its control of market giant Hulu) to extract ESPN fee increases from YouTube TV (Google), DirecTV Stream (AT&T/DirecTV), and Sling TV (Dish).

371.   There are no procompetitive benefits to Disney's anticompetitive SLPTV carriage agreements. To begin with, the ESPN Base Term is not required to provide cable bundles. Indeed, many consumers would prefer a base package that does not include ESPN and costs meaningfully less. Such a bundle is in fact feasible at a lower cost, as DirecTV Stream competitor YouTube TV threatened to offer such a bundle at a $15 discount during its carriage agreement negotiations with Disney.

372.   Moreover, the MFN agreements are not required for the product's existence. ESPN fees need not be tied to other agreements with SLPTV market participants. The MFNs prevent ad hoc price negotiations, whereas with MFNs, Disney can leverage its web of agreements to set a price floor and to exert upward pressure on prices.

373.     Finally, SLPTV products are distributed using existing Internet infrastructure. No bundling or MFN terms are required to deliver the product to consumers or to provide for recoupment of otherwise economically infeasible infrastructure investments, such as when cable companies lay cable or provide last-mile hardware to subscribers.

374.     At bottom, the purpose and effect of Disney's SLPTV carriage agreements, including the agreement with DirecTV Now, is to reverse the effects of cord-cutting on ESPN affiliate fees; to increase prices in the SLPTV Market, including prices charged through Disney's own Hulu + Live TV product; and to control the costs of rivals, including through a direct—and substantial—input into their prices.

375.     It is unmistakable that Disney's complained-of conduct has nearly doubled prices in the SLPTV Market. This injury, along with others alleged in this Complaint, are injuries that the antitrust laws were intended to prevent. Plaintiffs and the Class have suffered and will continue to suffer these injuries, including paying an anticompetitive overcharge for their DirecTV Stream subscriptions by reason of Disney's anticompetitive agreements. Plaintiffs and the Class have been and will be injured by Disney's violation of Section 1 of the Sherman Act.

376.     Plaintiffs and the Class seek treble damages, attorneys' fees, and costs, to compensate them for the money they overpaid for SLPTV services by reason of Disney's anticompetitive agreements. The amount of damages sustained by Plaintiffs and the Class is to be proven at trial, but is likely to exceed the approximately $15/month/user that DirecTV Stream competitor YouTube TV would have discounted for an ESPN-less base bundle but for—and as a proximate result of—YouTube TV's anticompetitive carriage agreement with Disney.

377.     Plaintiffs and the Class seek an injunction preventing Disney from enforcing its anticompetitive carriage agreements, including their ESPN Base Term and MFN clause(s).

378.     Plaintiffs and the Class also seek an injunction requiring segregation or divestiture by Disney of its Hulu subsidiary, or in the alternative, of its business assets relating to Hulu + Live TV.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Disney and that the Court grant the following:

A. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class.

B. Enter a judgment against Disney in favor of Plaintiffs and the Class;

C. Grant permanent injunctive relief to remedy the ongoing effects of Disney's unlawful and anticompetitive conduct;

D. Award Plaintiffs and the Class actual and/or trebled damages;

E. Award Plaintiffs and the Class their costs of suit, including reasonable attorney's' fees as provided by law; and

F. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: November 30, 2022

Respectfully submitted,

**BATHAEE DUNNE LLP**

 /s/ Brian J. Dunne
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v. forthcoming*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel: (213) 462-2772

 /s/ Yavar Bathaee
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (*pending admission*)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel: (332) 322-8835

*Attorneys for Plaintiffs and the Proposed Class*