1
2
3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MICHELLE FENDELANDER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY COMPANY,<br><br>Defendant. | Case No.  5:22-cv-07533-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS; TERMINATING AS MOOT MOTION TO STAY DISCOVERY**<br><br>Re: ECF Nos. 13, 43 |

Plaintiffs Michelle Fendelander, Ronda Lee Haines, Michael Hughes, John Manso, and Jasmine McCormick bring this antitrust putative class action lawsuit against Defendant The Walt Disney Company ("Disney") on behalf of all monthly subscribers of DirecTV Stream or its predecessors DirecTV Now, AT&T Now, and/or AT&T TV Now, from the period beginning April 1, 2019, through the present (hereinafter "Plaintiffs").  Class Action Compl. ("CAC"), ECF No. 1 ¶¶ 1, 345.

Pending before the Court are Defendant's motions to dismiss at ECF No. 13 and stay discovery at ECF No. 43.  The Court heard oral argument on Defendant's motion to dismiss on July 13, 2023.  The Court took Defendant's motion to stay under submission without oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons discussed herein, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART and Defendant's motion to stay is TERMINATED AS MOOT.

## I.      BACKGROUND

Plaintiffs are five individuals who reside in Nevada, Massachusetts, Iowa, Washington,

and Illinois, and are current subscribers of DirecTV Stream.  CAC ¶¶ 9–13.  Plaintiffs allege that Disney, through its subsidiaries ESPN and Hulu (collectively, the "Disney Entities"), entered into anticompetitive carriage agreements.  *Id.* ¶ 366.  The Disney Entities allegedly conspired with DirecTV to inflate prices of monthly subscriptions of the Streaming Live Pay TV market ("SLPTV"), set a price floor for the SLPTV market in violation of the Sherman Act § 1, and reduce consumer choice.  *Id.* ¶¶ 8, 345, 359.  Plaintiffs seek injunctive relief, treble damages, attorneys' fees and costs, and compensation for overpayment for SLPTV services.  *Id.* ¶¶ 376–78.

### A.    ESPN Affiliate Fees and Carriage Agreements

Disney controls certain network channels such as ABC Television Network, the Disney Channel, ESPN, and FX.  *Id.* ¶¶ 17, 311.  Disney owns an 80% interest share of ESPN with the remaining 20% owned by the Hearst Corporation.  *Id.* ¶ 17.  ESPN provides sports coverage as a part of cable packages.  *Id.* ¶ 30.  Since its inception in 1978, ESPN has gained significant popularity.  *Id.* ¶¶ 30, 36–37.  In 2012, ESPN expanded into several sister channels, including ESPN2, ESPNews, ESPN Classic, and ESPNU.  *Id.* ¶ 36.  Over the years, ESPN has brought in billions of dollars per year in fees to Disney from cable television networks in the United States.  *Id.* ¶¶ 45–46.

ESPN generates "affiliate fees," or fees charged to cable companies to broadcast a cable TV channel as part of a cable package or bundle.  *Id.* ¶ 48.  ESPN's affiliate fees are the most expensive affiliate fees charged to cable providers in the country.  *Id.* ¶¶ 51, 326.  For example, in 2012, ESPN fees were $5.13 per subscriber per month and, by 2016, the price climbed to $6.55, and over $9 per month in 2017.  *Id.* ¶¶ 48, 50, 54.  Comparatively, most channels in 2017 charged $1 per month in affiliate fees.  *Id.* ¶¶ 51, 54.  These costs are passed onto consumers via the cost of the bundle.  *Id.* ¶ 326.  Plaintiffs allege that through inflated affiliate fees for ESPN and its sister networks—which have steadily ballooned in price each year—Disney has direct input into TV bundle prices offered by its direct competitors.  *Id.* ¶¶ 49, 54.

Central to the CAC are the "web of carriage agreements" the Disney Entities maintain with

United States District Court
Northern District of California

all SLPTV market participants, including its leading competitors DirecTV Stream and YouTube TV.  *Id.* ¶¶ 5, 306.  The carriage agreements each contain an ESPN base term requirement and a most favored nation ("MFN") clause.  *Id.* ¶ 309.

ESPN Base Term Requirement: Disney's agreements require cable providers to include ESPN in the "basic" or cheapest cable or satellite packages.  *Id.* ¶¶ 57, 60.  A competitor that wishes to carry ESPN must agree to the base term requirement, meaning that if any SLPTV service carries ESPN as a part of *any* of its bundles, it must also carry ESPN in its base or cheapest bundle.  *Id.* ¶¶ 310, 338.  Put another way, to avoid including ESPN in the cheapest bundle, a provider cannot carry ESPN in any of its bundles.  The term restricts the ability of Disney's competitors carrying ESPN to provide an option to its SLPTV-customers that excludes ESPN.  CAC ¶ 309.  Absent this requirement, a competitor in the SLPTV market carrying ESPN could provide a "skinny" bundle to consumers that excludes ESPN.  *Id.* ¶ 312.  All three of the market-leading SLPTV services—YouTube TV, Hulu + Live TV, and DirecTV Stream—offer live television options with ESPN as part of the base bundle.  *Id.* ¶¶ 313, 338.  This means that substantially all consumers in the market must pay for ESPN.  *Id.* ¶ 339.

MFN Price Term: Disney also imposes MFN clauses in the carriage agreements with cable providers.  *Id.* ¶ 58.  Plaintiffs allege the MFN price term "requires Disney to provide the counterparty with the lowest price for ESPN and other channels offered to any other market participant."  *Id.* ¶¶ 315.  In other words, if Disney provides another service a lower price, then that price becomes the applicable price for its counterparty.  *Id.* ¶ 316.

**B.      Disney's Entry into the SLPTV Market**

Around 2013, internet streaming platforms like HBO, Amazon Prime, and Netflix were popular platforms for watching premium video content.  *Id.* ¶ 75.  However, consumers still needed a cable or satellite TV subscription to stream live television.  *Id.*  Some consumers opted not to purchase a cable or satellite package, instead purchasing internet-streaming platform subscriptions—a process referred to as "cord cutting."  *Id.* ¶ 76.  Despite this trend, the majority of

1  households (approximately 90%) maintained cable or satellite subscriptions. *Id.* ¶ 78.

2      In 2015, cable-only subscription services began to offer subscriptions to their content

3  entirely over the internet decoupled from cable or satellite TV packages—a process referred to as

4  "de-bundling." *Id.* ¶ 84.  For example, in 2014 HBO announced that it planned to de-bundle its

5  content from traditional cable and satellite TV plans upon the release of its HBO GO streaming

6  service, which would be available to people without a pay-TV subscription. *Id.* ¶¶ 85–86.  Studies

7  at the time suggest that cord cutting increased in the mid-2010s, meaning fewer consumers

8  purchased cable and satellite TV packages. *Id.* ¶ 86.  However, approximately 76% of Americans

9  still subscribed to cable or satellite TV. *Id.*

10      The rise of Virtual Multichannel Video Programming Distributors ("vMVPD") that

11  streamed live TV channels over the internet began around this time. *Id.* ¶¶ 84, 135.  Companies

12  like YouTube, Hulu, and Sling began offering live pay television that rivaled cable and satellite

13  TV offerings. *Id.* ¶ 131.  Live streaming TV provided an alternative to cable at a much lower cost.

14  *Id.* ¶ 137.  With live internet-streaming platforms, consumers no longer needed to purchase

15  satellite or cable to view live channels. *Id.* ¶ 75.  Unlike traditional MVPDs, *i.e.*, cable and

16  satellite TV services, vMVPDs did not use proprietary cable or dish transmission media, instead

17  relying on existing Internet infrastructure to transmit live pay TV channels over the internet. *Id.* ¶

18  135.

19      From 2012 to 2017, Disney lost millions of customer-subscribers, from 100M down to

20  88M, due to cord cutting. *Id.* ¶¶ 99–100.  Cord cutting or de-bundling enabled consumers to opt-

21  out of paying ESPN affiliate fees because subscribers could choose which channels would be

22  included in the bundle, meaning they could choose to exclude ESPN from their bundle. *Id.* ¶¶ 96–

23  97.  For example, in 2017, new companies, like Verizon, began providing live TV cable packages

24  over the Internet. *Id.* ¶ 103.  They provided "skinny" or basic bundles that were less bloated (*i.e.*,

25  less expansive) than cable packages and allowed subscribers to choose channels. *Id.* ¶¶ 102, 109–

26  10.

27  Case No.: 5:22-cv-07533-EJD
28  ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
MOOT MOT. TO STAY DISCOVERY

*United States District Court*
*Northern District of California*

1    In 2017, Disney announced that it would acquire 21st Century Fox.  *Id.* ¶ 148.  At the time

2    of acquisition, Fox had a one third interest in the live-streaming internet service, Hulu.  *Id.* ¶ 150.

3    By 2019, Disney obtained 67% interest in Hulu, or full "operational" control.[1]  *Id.* ¶ 153.  Hulu is

4    a subscription-based video streaming service that offers video on demand services and live

5    streaming television services.  *Id.* ¶ 16.  Hulu's live streaming television service (or vMVPD) is

6    called Hulu + live TV.  *Id.*

7    Since the acquisition Disney has substantially raised Hulu's subscription prices as well as

8    the ESPN affiliate fees.  *Id.* ¶¶ 166–67.  In November 2019, Disney raised the price of Hulu's +

9    Live TV offering by $10, bringing the cost of the base package to $54.99 per month.  *Id.* ¶ 157.

10   At the time, Hulu + Live TV had 2.7 million subscribers—approximately half of all subscribers to

11   streaming live TV platforms.  *Id.* ¶ 157.  Plaintiffs allege that competing platforms followed Hulu

12   and increased the cost of their packages.  *Id.* ¶ 158.  In the following years, AT&T DirecTV's

13   streaming live TV offering raised its base package by $15, and one year later, YouTube TV raised

14   prices by $15 per month—both rising to $65 per month.  *Id.* ¶¶ 159, 162.

15   As the expiration of the carriage agreements neared, the Disney Entities needed to

16   negotiate new agreements with SLPTV providers.  *Id.* ¶¶ 167–68.  The first carriage agreement

17   with AT&T DirecTV expired in the Fall of 2019.  *Id.* ¶ 171.  AT&T was not initially willing to

18   give into the Disney Entities' carriage agreement demands.  *Id.* ¶ 174.  The Disney Entities began

19   a public campaign warning subscribers of the impending loss of access to ESPN due to the

20   companies' carriage dispute.  *Id.* ¶¶ 171–73.  The parties reached a deal five days later.  *Id.* ¶ 174.

21   In the weeks following the deal, AT&T DirecTV raised the price of its live TV streaming service

22   base package by $15, to $65 per month.  *Id.* ¶ 175.  AT&T released a statement attributing the

23   price hike to the increased cost to deliver content to customers.  *Id.*

24   From 2019 to 2022, the Disney Entities entered into a series of carriage agreements with

25

26   _____

27   [1] Plaintiffs allege that Disney has agreed to purchase the remaining 33% ownership interest from
     NBC Universal in January 2024.  *Id.*

     Case No.: 5:22-cv-07533-EJD

28   ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

United States District Court
Northern District of California

United States District Court
Northern District of California

SLPTV providers that contained the ESPN "base package" requirement and MFN clauses—resulting in price increases to these streaming platform's subscription plans. *Id.* ¶ 177.

- AT&T's DirecTV: Disney entered into a new carriage agreement with AT&T's DirecTV. *Id.* ¶ 174. This agreement contained a base term that forced DirecTV to include ESPN in its most basic package, as well as an MFN clause. *Id.* ¶ 177. In the following weeks, AT&T raised the price of its live TV streaming service base package by $15, totaling $65 per month. *Id.* ¶ 175. AT&T released a statement that their adjusted pricing "reflect[s] the cost to deliver content to our customers." *Id.* ¶ 175. At the time, Disney Hulu + Live TV was priced at only $55 per month—$10 less expensive than AT&T's DirecTV. *Id.* ¶ 177.

- Google's YouTube TV: YouTube TV is the largest SLPTV provider in the U.S. *Id.* ¶ 25. Disney had a legacy carriage agreement with Google's YouTube TV that required Google to carry ESPN as a part of its basic streaming live TV package. *Id.* ¶ 183. Google's prices mirrored Disney's price increases until 2021, when the agreement was set to expire. *Id.* ¶¶ 183, 187. The parties began to negotiate a new carriage agreement. *Id.* ¶ 187. Google threatened to offer a base package without ESPN and publicly stated that having ESPN in its basic package increased the package cost by $15 per month (an increase from $50 to $65 per month). *Id.* ¶ 188. Without ESPN channels, YouTube TV said it would drop its monthly subscription price from $64.99 to $49.99. *Id.* ¶ 195. Nevertheless, the parties entered a new carriage agreement in 2021. *Id.* ¶ 197. Google's YouTube TV kept ESPN in its base package and increased its subscription cost to $65 per month. *Id.* ¶¶ 197, 199.

- Dish's Sling TV: Disney also had a legacy carriage agreement with Dish's Sling TV that required Sling TV to include ESPN in its basic bundle. *Id.* ¶ 204. The legacy agreement expired in 2022. *Id.* ¶ 207. Negotiations faltered over the MFN clause,[2] and Disney cut Sling TV's access to its channels. *Id.* ¶¶ 208, 211. After negotiations failed, Dish released a statement that Disney was trying to hike up its affiliate fees by "exploit[ing] its market position." *Id.* ¶ 209. Disney and Sling TV reached a new carriage agreement in 2022. *Id.* ¶ 213. Dish TV increased the price of its base package by $5 per month, totaling $40 per month, because of the increased cost of "programming." *Id.* ¶¶ 214, 217.

While these negotiations were going on, in 2020, Disney again raised Hulu Live + TV's price by $10, bringing its base plan to $64.99 per month. *Id.* ¶ 163.

Plaintiffs specifically allege that, since Disney took over Hulu, the price delta between the

---

[2] At the time Dish Sling TV negotiated renewal of the carriage agreements, Disney had already entered into carriage agreements with Google's YouTube TV and AT&T's DirecTV Stream. *Id.* ¶ 212. These agreements increased the ESPN fees and contained MFN clauses. *Id.* Due to the MFN clauses, Disney would either need to lower fees for both Google YouTube TV and AT&T DirecTV, or raise ESPN fees for Dish Sling TV. *Id.*

Case No.: 5:22-cv-07533-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS MOOT MOT. TO STAY DISCOVERY

cost of cable TV packages and live-streaming packages narrowed from $15 to $35 per month to nearly identical monthly prices to cable packages. *Id.* ¶ 220. Hulu and YouTube TV are the two top streaming TV providers, capturing 70% of all streaming love TV subscribers. *Id.* ¶ 222. Both providers charge approximately the same subscription price. *Id.* ¶ 223. YouTube TV's base package costs $64.99 per month, and Hulu + Live TV costs $69.99 per month, with both services reaching prices well above $70 per month when additional options are added. *Id.*

### C.    Relevant Market

The CAC defines the relevant market as the SLPTV Market. *Id.* ¶ 226. SLPTV is a distinct sub-market of the "Live Pay TV Market" ("the "LPTV Market"), or providers of live television including cable or satellite television providers. *Id.* ¶ 226. The SLPTV Market includes subscription-based services that provide access to live television channels over a broadband internet connection, provided as bundles of channels. *Id.* ¶ 227. SLPTV providers create "basic packages" which include the minimum number of channels a subscriber must purchase access to as part of a subscription. *Id.* ¶ 228. Subscribers cannot choose individual channels to include in SLPTV subscriptions. *Id.* ¶ 228. SLPTV products are generally available on multiple devices, including tablets, smart phones, PCs, laptops, televisions, and game consoles. *Id.* ¶ 230.

Plaintiffs allege the following SLPTV market participants: Google's YouTube TV, Disney's Hulu + Live TV, AT&T's DirecTV Stream (previously branded DirecTV Now and AT&T Now), Dish's Sling TV, and Fubo TV. *Id.* ¶ 276. At the time of filing the CAC, YouTube TV has the largest market concentration with over 5,000,000 subscribers, followed by Hulu + Live TV with approximately 4,100,000 subscribers. *Id.* ¶ 277. Participants' revenue shares are proportionally distributed with market share. *Id.* ¶ 278. Plaintiffs allege the SLPTV market is highly concentrated. *Id.* ¶ 279. The Herfindahl-Hirschman Index (HHI) of the market shares is 2794, which exceeds the HHIs the DOJ considered to be "moderately concentrated" or 1,500 and 2,500 HHIs. *Id.* ¶¶ 279–80.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### D.    Procedural History

On November 30, 2022, Plaintiffs filed the instant action.  On January 31, 2023, Disney moved to dismiss the action in its entirety.  Mot. to Dismiss the Pls.' Compl. ("MTD"), ECF No. 13.  Plaintiffs oppose the motion.  Pls.' Opp'n to Def. The Walt Disney Co.'s Mot. to Dismiss the CAC ("Opp'n to MTD"), ECF No. 36.  While the motion to dismiss was pending, Disney moved to stay discovery pending resolution of the motion to dismiss.  Mot. to Stay ("MTS"), ECF No. 43.  Plaintiffs oppose staying discovery.  Pls.' Opp'n to Def. The Walt Disney Co.'s Mot. to Stay ("Opp'n to MTS"), ECF No. 47.

## II.    LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully," the plausibility standard "is not akin to a probability requirement." *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court need not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).  The Court may also "look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Shaw v. Hahn*, 56 F.3d 1128,

1    1129 (9th Cir. 1995).

2    **III.    DISCUSSION**

3        **A.    Sherman Act § 1**

4        Plaintiffs allege a singular cause of action for restraint of trade under Sherman Act § 1.

5    Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or

6    conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is

7    declared to be illegal." 15 U.S.C. § 1.  A plaintiff asserting a claim under § 1 must plead: "(1) a

8    contract, combination or conspiracy among two or more persons or distinct business entities; (2)

9    which is intended to restrain or harm trade; (3) which actually injures competition; and (4) harm to

10   the plaintiffs from the anticompetitive conduct." *Name.Space, Inc. v. Internet Corp. for Assigned*

11   *Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quotations omitted).  Because § 1 does

12   not forbid all unreasonable restraints of trade, "the crucial question is whether the challenged

13   anticompetitive conduct stems from independent decision or from an agreement, tacit or express."

14   *Twombly*, 550 U.S. at 553.  Generally, "the accepted standard for testing whether a practice

15   restrains trade in violation of § 1" is the "rule of reason" standard.  *Leegin Creative Leather*

16   *Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  A plaintiff may also allege that a restraint

17   is one that has already been "deemed unlawful per se." *State Oil Co. v. Khan*, 522 U.S. 3, 10

18   (1997).  Plaintiffs allege both theories in the CAC.

19       Disney argues that (1) Plaintiffs *per se* claims should be dismissed because Plaintiffs allege

20   a vertical restraint, and even if the alleged restraints were horizontal, Plaintiffs have not stated a

21   *per se* violation; (2) Plaintiffs fail to state a claim under the rule of reason because Plaintiffs have

22   failed to plead a relevant antitrust market in which Disney has power and fails to plead agreements

23   that unreasonably restrain trade; and (3) Plaintiffs claims for damages are barred.  The Court

24   addresses each argument in turn.

25           **1.    Plaintiffs fail to allege a *per se* violation of § 1**

26       Antitrust conspiracies are generally classified as either vertical restraints, such as an

27

28   Case No.: 5:22-cv-07533-EJD
     ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

*United States District Court*
*Northern District of California*

9

United States District Court
Northern District of California

1  agreement made between a manufacturer and a retailer, or as horizontal restraints, meaning

2  agreements among competitors.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d

3  1186, 1191 (9th Cir. 2015).  Courts must "examin[e] the economic relationship between the

4  parties" to determine whether it is categorized as horizontal or vertical.  *Dimidowich v. Bell &*

5  *Howell*, 803 F.2d 1473, 1480 (9th Cir. 1986); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,

6  485 U.S. 717, 730 n.4 (1988) (characterization of the restraint does not depend on whether the

7  anticompetitive effects are horizontal or vertical).  Vertical restraints are presumptively examined

8  under a rule of reason analysis.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  This analysis

9  accounts for the fact that a vertical restraint "may have procompetitive justifications that benefit

10  consumers."  *In re Musical Instruments*, 798 F.3d at 1192.  Conversely, "*per se* liability is

11  reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of

12  the industry is needed to establish their illegality.'"  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)

13  (quoting *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  This is because

14  conduct deemed *per se* unlawful "always or almost always tend to restrict competition and

15  decrease output."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979).  To

16  justify a *per se* prohibition, a restraint must have "manifestly anticompetitive" effects.  *Cont'l T.*

17  *V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977).  In general, only agreements between

18  competitors to restrain trade, *i.e.*, horizontal agreements, qualify as unreasonable *per se*.[3]  *Ohio v.*

19  *Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018).  Once a plaintiff has established the existence

20  of a horizontal agreement, "no further inquiry into the practice's actual effect on the market or the

21  parties' intentions is necessary to establish a § 1 violation."  *In re Musical Instruments*, 798 F.3d

22  at 1191.

23       It is undisputed that ESPN executes carriage agreements with SLPTV providers in which

24  ESPN provides network channels to subscription-based streaming service platforms such as

25

26

27  [3] The Court notes that "not all horizontal agreements between competitors are per se invalid." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003).

1   AT&T's DirecTV and Google's YouTube TV.  It is also undisputed that Disney owns an 80%

2   interest share of ESPN and a 66% controlling interest in a subscription-based streaming service

3   platform, Hulu, which provides a live streaming service called Hulu + Live TV that competes in

4   the SLPTV market.  Plaintiffs allege that the Disney Entities and SLPTV providers entered into

5   carriage agreements containing the ESPN base term and MFN clause, which purportedly restrains

6   competition.  CAC ¶¶ 314–15.  Plaintiffs characterize these carriage agreements as horizontal

7   agreements between direct competitors because Disney and its subsidiaries purportedly function as

8   one entity or enterprise.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).

9       Disney argues, however, that the carriage agreements are vertical restraints because they

10   are agreements between competitors at the same level of the distribution chain.  MTD at 8–9.

11   According to Disney, the carriage agreement is a classic supplier-distributor relationship: a

12   television network programmer, such as ESPN, agrees to sell distribution rights to its ESPN

13   network and, in exchange, the SLPTV provider pays a fee to carry the channel.  Mot. at 2; *see Bus.*

14   *Elecs. Corp.*, 485 U.S. at 730 (defining "agreement[s] between firms at different levels of

15   distribution," such as between a supplier and distributor, as "vertical restraints").  The

16   determinative consideration, according to Disney, is the parties' relationship with respect to the

17   agreement at issue.  Using this framework, Disney asserts it is akin to a dual distributorship "in

18   which a manufacturer operates at two distinct levels of the distribution chain in the same market

19   by acting as both a supplier and a distributor of its own products."  *Dimidowich v. Bell & Howell*,

20   803 F.2d 1473, 1480 (9th Cir. 1986) (explaining that dual distributorships are vertical and

21   analyzed under the rule of reason).

22       Whether a restraint is characterized as horizontal or vertical depends on the relationship

23   between the parties.  *See Bus. Elecs. Corp.*, 485 U.S. at 730 (holding that "[r]estraints imposed by

24   agreement between competitors have traditionally been denominated as horizontal restraints, and

25   those imposed by agreement between firms at different levels of distribution as vertical

26   restraints.").  "'An arrangement is said to be 'horizontal' when its participants are (1) either actual

27

28   Case No.: 5:22-cv-07533-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
MOOT MOT. TO STAY DISCOVERY

United States District Court
Northern District of California

1    or potential rivals at the time the agreement is made; and (2) the agreement eliminates some

2    avenue of rivalry among them.'" *In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 867

3    (N.D. Ill. 2010) (quoting 11 H. Hovenkamp, Antitrust Law ¶ 1901b, p. 203 (2d ed. 2005)).  Here,

4    the only agreements at issue are carriage agreements between ESPN and SLPTV providers in

5    which ESPN provides the ESPN network to SLPTV streaming platforms within the same

6    distribution chain—a relationship that is categorically vertical.  *United States v. Topco Assocs.,*

7    *Inc.*, 405 U.S. 596, 608 (1972) (defining vertical restraint as a "combination[ ] of persons at

8    different levels of the market structure, e.g., manufacturers and distributors").  Plaintiffs do not

9    allege that ESPN competes with the SLPTV providers, nor do Plaintiffs allege that Hulu—or even

10   Disney through Hulu—entered into a horizontal agreement with a competitor.

11          Relying on *Copperweld*, Plaintiffs characterize the carriage agreements as horizontal

12   restraints because the Disney Entities operate as a "single economic unit."  Opp'n at 7.  Plaintiffs

13   specifically allege that Disney operates both Hulu and ESPN with "unfettered control and a unity

14   of interest and purpose" such that ESPN, Hulu, and Disney all function as a "single economic

15   unit" under Disney's operational control.  CAC ¶¶ 18–20.  In *Copperweld*, the Supreme Court

16   considered antitrust liability of parents and subsidiaries, holding that a parent and its wholly

17   owned subsidiary cannot conspire with each other for purposes of Section 1.  *Copperweld Corp.*,

18   467 U.S. at 777.  In reaching this conclusion, the Court reasoned that "the coordinated activity of a

19   parent and its *wholly owned* subsidiary must be viewed as that of a *single enterprise* for purposes

20   of § 1 of the Sherman Act.  A parent and its wholly owned subsidiary have a c*omplete unity of*

21   *interest*."  *Id.* at 771 (emphasis added); *see also id.* at 772 n.18 ("[T]he parent and the subsidiary

22   must be viewed as a single economic unit.").

23          Later, in *Arandell Corporation v. Centerpoint Energy Services, Inc.*, the Ninth Circuit

24   interpreted *Copperweld* as follows:

25                  If "a parent and a wholly owned subsidiary *always* have a 'unity of
                    purpose'" and act as a "single enterprise" whenever they engage in
26                  "coordinated activity," then a subsidiary such as [defendant] as a
                    matter of law *cannot* innocently advance an anticompetitive scheme .
27                  . . for a legitimate business purpose, while its parent and sister

United States District Court
Northern District of California

1

companies purposely advance the very same scheme . . . for an illegal, anticompetitive purpose.
. . .

2

3

In sum, *Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it is a part.

4

5

900 F.3d 623, 630–32 (9th Cir. 2018) (emphasis in original).

6

Divorced from its context, Plaintiff's interpret *Copperweld* and *Arandell* as suggesting that

7

the carriage agreements between ESPN and SLPTV providers must be construed as agreements

8

between the Disney Entities as a whole (*i.e.*, ESPN, Disney, and Hulu) and the SLPTV providers,

9

in effect dissolving the separate corporate personalities if the parent and subsidiary.  Thus, because

10

ESPN's parent company, Disney, also owns controlling interest in an SLPTV provider (Hulu) that

11

competes in the same product market as the SLPTV providers contracting with ESPN (DirecTV

12

Stream), the carriage agreements are horizontal restraints for § 1 purposes.  However, Plaintiffs

13

fail to cite a single case in this district that permits such an expansive reading of *Copperweld*.

14

Many courts in this district—including this Court—have applied *Copperweld*'s "single

15

enterprise" language to establish a subsidiaries' and/or an affiliates' individual participation in an

16

anticompetitive conspiracy by alleging the entities are part of a "corporate family" that "operates

17

as a single enterprise" for pleading purposes.  *See, e.g.*, *Hightower v. Celestron Acquisition, LLC*,

18

No. 5:20-CV-03639-EJD, 2021 WL 2224148, at *10 (N.D. Cal. June 2, 2021); *Jones v. Micron*

19

*Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019); *In re Cathode Ray Tube (CRT) Antitrust*

20

*Litig.*, 738 F. Supp. 2d 1011, 1019–22 (N.D. Cal. 2010); *In re TFT–LCD*, 599 F.Supp.2d 1179,

21

1184–85 (N.D. Cal. 2009).[4]  Plaintiffs cite the Undersigned's decision in *Hightower* in support of

22

23

24

25

26

27

28

[4] Not all the cited cases refer to *Copperweld* or specifically reference a "single enterprise."  *See In re Cathode Ray Tube*, 738 F. Supp. 2d 1011; *Jones*, 400 F. Supp. 3d 897; *cf. Hightower*, 2021 WL 2224148 (discussing *Copperweld* and whether defendant entities operate as a single enterprise). However, each case describes the elements necessary to allege that a corporate family functions as a single enterprise: "that individual corporate participants and their agents: (i) "did not always know the corporate affiliation of their counterparts;" (ii) acted on behalf of every company in their family; and (iii) entered into agreements on behalf of their respective corporate families."  *Jones*, 400 F. Supp. 3d at 922.

Case No.: 5:22-cv-07533-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS MOOT MOT. TO STAY DISCOVERY

13

United States District Court
Northern District of California

1    its application of *Copperweld*.  However, this Court's application of *Copperweld* was confined to

2    the narrow context of whether plaintiffs sufficiently alleged that each defendant participated in the

3    alleged conspiracy by nature of belonging to a corporate family that operated as a single

4    enterprise.  The Court declines to expand *Copperweld*'s scope beyond this context.  *See Mitchael*

5    *v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (declining to hold that a subsidiary and its

6    parent as "one entity for all § 1 purposes, and either one can be liable for conspiring to restrain

7    trade").

8            Finally, while some vertical agreements may constitute a *per se* violation, Plaintiff has

9    failed to allege a *per se* anticompetitive restraint.[5]  *See Brantley v. NBC Universal, Inc.*, 675 F.3d

10   1192 (9th Cir. 2012).  A restraint traditionally subject to *per se* treatment will only be found to be

11   per se illegal if it "facially appears to be one that would almost always tend to restrict competition

12   and decrease output," *i.e.*, if it is a naked restraint on trade.  *Nat'l Collegiate Athletic Ass'n v. Bd.*

13   *of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984) (citation omitted).  Typical examples of

14   *per se* restraints include agreements between competitors to fix prices, divide markets, and refuse

15   to deal.  *In re Musical Instruments*, 798 F.3d at 1191.  Here, Plaintiffs allege that the combined

16   effect of contractual restraints—the ESPN base term and the MFN clause—in Disney's carriage

17   agreements allow Disney to set prices in the SLPTV market by forcing a minimum price on the

18   SLPTV market.  *Id.* ¶¶ 364–67.  While MFN clauses can be used for anticompetitive ends, they

19   are not *per se* unlawful.  *See, e.g.*, *Blue Cross & Blue Shield United of Wisconsin v. Marshfield*

20   *Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (MFN clauses do not constitute price-fixing); *In re*

21   *Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 692 (S.D.N.Y. 2012) ("MFN clauses are

22   customarily subject to the rule of reason.").  With respect to the ESPN base term, Plaintiffs allege

23   the base term is an agreement on what product can be offered at the lowest price point offered by

24   SLPTV providers.  CAC ¶ 319.  On its face, Disney's base term requirement does not appear to

25   ───────────────

26   [5] For example, vertical agreements that facilitate horizontal collusion and "[v]ertical agreements
     that foreclose competitors from entering or competing in a market can injure competition by
27   reducing the competitive threat those competitors would pose."  *Brantley*, 675 F.3d at 1198.

     Case No.: 5:22-cv-07533-EJD
28   ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

1   lack any redeeming value such that it warrants *per se* treatment.

2          Accordingly, Plaintiffs have failed to establish a *per se* horizontal agreement between

3   competitors to restrain trade.

4                          **2.    Plaintiffs allege a vertical restraint in violation of the Rule of Reason**

5          As an alternative to its claim of a *per se* violation of Section 1, Plaintiffs also allege a

6   claim under the rule of reason.  CAC ¶ 368.

7          To establish a rule of reason violation a plaintiff must plead "(1) a contract, combination or

8   conspiracy among two or more persons or distinct business entities; (2) by which the persons or

9   entities intended to harm or restrain trade or commerce among the several States, or with foreign

10  nations; (3) which actually injures competition."  *Brantley*, 675 F.3d at 1197.

11         Before the court can apply the rule of reason, the court must consider the relevant market.

12  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).  A plausible relevant market must include

13  a geographic and a product market.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2008).

14  An alleged relevant market can survive a motion to dismiss "unless it is apparent from the face of

15  the complaint that the alleged market suffers a fatal legal defect."  *Newcal Indus., Inc. v. Ikon Off.*

16  *Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

17                          **a.    Relevant market in which Disney has Market Power**

18         First, Disney contends Plaintiffs fail at the threshold inquiry by failing to allege the proper

19  relevant market.  MTD at 12.

20         To plead § 1 of the Sherman Act, a plaintiff "must allege both that a 'relevant market'

21  exists and that the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Office*

22  *Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  The relevant market is defined as "the area of effective

23  competition."  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)

24  (quotations and citation omitted).  There are two components to a relevant market: the geographic

25  market and the product market.  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

26  1373 (9th Cir. 1989).

27

28

United States District Court
Northern District of California

1    A product market "must encompass the product at issue as well as all economic substitutes

2    for the product." *Newcal Indus.*, 513 F.3d at 1045.  "The outer boundaries of a product market are

3    determined by the reasonable interchangeability of use or the cross-elasticity of demand between

4    the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325

5    (1962).  Well-defined submarkets may constitute product markets for antitrust purposes.  *Id.*;

6    *Thurman Indus.*, 875 F.2d at 1374 ("In limited settings . . . the relevant product market may be

7    narrowed beyond the boundaries of physical interchangeability and cross-price elasticity to

8    account for identifiable submarkets or product clusters.").  To plead a relevant submarket, a

9    plaintiff must plausibly allege "that the alleged submarket is economically distinct from the

10   general product market." *Newcal*, 513 F.3d at 1045.  Whether a submarket is economically

11   distinct is determined by "examining such practical indicia", including: (1) industry or public

12   recognition of the submarket, (2) peculiar characteristics and uses of the product, (3) unique

13   production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and

14   (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325 (1962).  "At bottom, economic distinction

15   depends on whether the purported submarket is meaningfully insulated [] from competition with

16   other products in the broader market." *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d

17   745, 756 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021)

18   (quotations and citation omitted).

19   Plaintiffs define the relevant product and geographic market as the SLPTV market in the

20   United States.[6]  CAC ¶¶ 226, 281.  The SLPTV market is a submarket of the broader LPTV

21   market, which includes providers of cable and satellite television.  *Id.*  SLPTV is a subscription-

22   based service provided by Virtual Multichannel Video Programming Distributors ("vMVPDs").

23   *Id.* ¶ 226.  In the SLPTV market, SLPTV providers, or vMVPDs, sell "subscription-based services

24   that provide access to live television channels over a broadband internet connection" via channel

25

26   _____

27   [6] To the extent Disney challenges the relevant market, the parties do not appear to dispute the
     geographic market.  *See* CAC ¶¶ 278–86.

     Case No.: 5:22-cv-07533-EJD
28   ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

packages or bundles.  *Id.* ¶ 227.  vMVPDs provide a "base" package level to SLPTV subscribers which contains the minimum number of channels of all the package tiers.  *Id.* ¶ 228.

Plaintiffs allege the industry and public recognize the SLPTV submarket as a "separate economic entity" from the LPTV market.  *Id.* ¶ 232.  Industry participants distinguish the differences in how SLPTV delivers video content.  *Id.* ¶ 233–36.  For example, SLPTV products are more flexible than traditional LPTV products because they do not require separate transmission infrastructure or technology such as cable boxes or a satellite dish.  *Id.* ¶¶ 238–42, 245.  Instead, SLPTV products rely on existing broadband internet connections, which enables SLPTV subscribers to use laptops, PC, game consoles, smart TVs, tablets, and smartphones to stream live TV channels without needing to connect to additional hardware.  *Id.* ¶¶ 242–43.  The SLPTV market also has distinct customers from the LPTV market, which tend to skew younger— with around 91% of 18-to 29-year-olds in the U.S. participating in the market—and tend to consume less video using cable television.  *Id.* ¶¶ 262–64.  Not only do younger viewers prefer live stream television, but many also prefer to watch using hand-held devices.  *Id.* ¶ 264.  Finally, the SLPTV bundles have historically included fewer channels than LPTV bundles and therefore typically cost less and the SLPTV market is not as sensitive to price changes as traditional cable.  *Id.* ¶¶ 269, 271.

Disney argues, however, that the SLPTV market is downstream from where the alleged restraint occurs.[7]  As the Ninth Circuit observed, "[t]he television programming industry can be divided into upstream and downstream markets."  *Brantley*, 675 F.3d at 1195.  The "upstream market" is composed of television programmers that own television channels and the

---

[7] Disney also argues in a footnote that the relevant market is facially defective because the CAC suggests traditional MVPDs are substitutes for vMVPDs (the SLPTV submarket).  MTD at 13 n.3; *see* CAC ¶¶ 115, 136, 234, 236, 265–66.  The Court is not persuaded that the MVPD market is an economic substitute that has "actual or potential ability to deprive" vMPVDs of "significant levels of business."  *Thurman Indus., Inc.*, 875 F.2d at 1374 (9th Cir. 1989).  Such a question is better resolved at the summary judgment stage.  *See e.g.*, *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010).

Case No.: 5:22-cv-07533-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS MOOT MOT. TO STAY DISCOVERY

United States District Court
Northern District of California

"downstream market" is where distributors sell the channels to consumers. *Id.* According to

Disney, the correct market is upstream, or where ESPN and vMVPD negotiations occur since that

is where the carriage agreements are being negotiated, *i.e.*, where competition is being restrained.

MTD at 12. Plaintiffs contend, however, the proper market "is the market in which Plaintiffs

purchased the price-inflated product—the SLPTV product—because the relevant consumer for

market definition purposes is the SLPTV subscriber, not Disney's SLPTV competitors that entered

into unlawful agreements with it." Opp'n to MTD at 18.

As a threshold matter, the Court observes that the existence of a relevant market and

whether a defendant has power within that market are typically factual inquiries for the trier of

fact. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Allegations of

a relevant market and market power generally pass the test at the pleading stage unless the market

definition is "facially unsustainable." *Id.*

When assessing the relevant market, courts must focus on anticompetitive effects "in the

market where competition is [allegedly] being restrained." *Qualcomm Inc.*, 969 F.3d at 992

(alteration in original) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057

(9th Cir. 1999)). Plaintiffs allege that competition is harmed in the SLPTV market. CAC ¶¶ 307–

08, 368. Television programmers sell channels to SLPTV providers (or vMVPDs), and SLPTV

providers are harmed by the anticompetitive terms in the carriage agreements, which have caused

prices for SLPTV subscriptions to nearly double and have limited consumer choice. *Id.* ¶ 368–69.

Thus, competition is allegedly being unreasonably restrained in the SLPTV market. The Court

finds this product market definition adequate at this stage given Plaintiffs' theory of harm. *See*

*Brantley v. NBC Universal, Inc.*, No. 07-CV-6101CASVBKX, 2008 WL 11357958, at *3 n.2

(C.D. Cal. June 25, 2008) ("That the restrained market is upstream from the consumer plaintiffs

may make standing more difficult to establish, but it does not, in and of itself, render the product

market definition insufficient.").

In addition to defining a relevant market, a plaintiff must plead "that the defendant has

1    power within that market." *Newcal Indus., Inc.*, 513 F.3d at 1045.  "Market power" under § 1

2    refers to "the ability to raise prices above those that would be charged in a competitive market."

3    *NCAA v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 109 n.38 (1984).  Direct evidence

4    of market power includes a showing of restricted output and supracompetitive prices.  *Theme*

5    *Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008).  Indirect or

6    circumstantial evidence requires the plaintiff to "(1) define the relevant market, (2) show that the

7    defendant owns a dominant share of that market, and (3) show that there are significant barriers to

8    entry and . . . that existing competitors lack the capacity to increase their output in the short run."

9    *Rebel Oil*, 51 F.3d at 1434.

10       The allegations rely on Disney's ownership interests in ESPN (i.e., the ESPN Network)

11   and Hulu and the carriage agreements, which vests Disney with market power.  For example, the

12   CAC alleges that Disney has "pricing power over the entire market" based on ESPN's carriage

13   agreements with all leading SLPTV market competitors.  CAC ¶¶ 3–5.  Disney's control of the

14   second largest SLPTV provider, Hulu, and its control of the "largest input into every SLPTV

15   product in the country," ESPN, in combination with the base term and MFN clauses in the ESPN

16   carriage agreements enable Disney to impose inflated costs on competitors and set a price floor.

17   *Id.*  The Court likewise finds that these allegations are sufficient at the pleading stage.  *See*

18   *Brantley*, 2008 WL 11357958, at *3 (holding plaintiffs sufficiently alleged market power where

19   the complaint alleged that each of the programmer defendants maintains market power by virtue of

20   its ownership of key broadcast networks or cable channels).

21       In sum, Plaintiffs have adequately alleged a relevant market in which Disney has market

22   power for Rule 12(b)(6) purposes.

23              **b.    Agreements that unreasonably restrain trade**

24       Finally, Disney maintains Plaintiffs have failed to plead the existence of vertical

25   agreements that could be unreasonable restraints of trade under the rule of reason.  To state a rule

26   of reason claim, a plaintiff must show in factual detail "an injury to competition, rather than just

United States District Court
Northern District of California

United States District Court
Northern District of California

1    an injury to plaintiff's business." *Sicor, Ltd. v. Cetus Corp.*, 51 F.3d 848, 854 (9th Cir. 1995).

2            Plaintiffs allege that the base term and MFN clause unreasonably restrains trade.  The base

3    term requirements allow Disney direct input into competitor pricing and the MFN clause allows

4    Disney to set the lowest price available for ESPN across the entire market because (i) Disney owns

5    Hulu + Live TV, which enables Disney to set a minimum price, and (ii) "there is no competitive

6    ESPN-less product" in the market.  CAC ¶¶ 318–19, 367.  This means that ESPN affiliate fees

7    negotiated with any given cable operator represent an "industrywide price floor."  *Id.* ¶¶ 58, 318.

8    For example, if prices for ESPN increased, Disney's agreements with other providers ensured that

9    cable package prices would all increase lockstep.  *Id.* ¶ 60.  Conversely, "if Disney lowers the cost

10   of Hulu + Live TV by 10%, the MFN price term requires that other provider-competitors receive

11   the same price."  *Id.* ¶ 320.  However, Disney would not be motivated to do so "since any discount

12   to one cable or satellite provider would mean providing a market-wide discount to all other

13   counterparties."  *Id.* ¶ 60.  Thus, it operates as a price floor and exerts upward pressure on prices.

14   *Id.* ¶ 367.

15           Plaintiffs allege that the Disney Entity's carriage agreements ensure pricing parity or

16   increasing prices without a "competitive check."  *Id.* ¶¶ 60–61.  According to Plaintiffs, ESPN

17   cost increases affect competitors but are "illusory" or a "mere accounting fictions" as to Hulu +

18   Live TV.  *Id.* ¶ 323.  In other words, because Disney controls both ESPN and Hulu, Disney can

19   impose ESPN affiliate fees on SLPTV providers without meaningfully increasing costs for its own

20   SLPTV product, Hulu + Live TV.  *Id.* ¶ 365.  As Disney increases the cost of ESPN fees, the cost

21   of the cheapest bundles also increases.  CAC ¶ 327.  Plaintiffs allege that there are no

22   procompetitive benefits to forcing customers to subscribe to ESPN as part of base packages.[8]  *Id.* ¶

23   

24   [8] Disney does not allege the base term or MFN clause have procompetitive advantages, but Disney
     challenges whether MFN clauses can harm competition.  MTD at 16–18.  As previously noted,
25   MFN clauses can be used for anticompetitive ends.  *See, e.g.*, *In re Elec. Books*, 859 F. Supp. 2d
     671; *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) (discussing
26   anticompetitive effects of MFN clauses); *Willamette Dental Group, P.C. v. Oregon Dental Serv.
     Corp.*, 130 Or.App. 487, 496 (1994) ("We note, moreover, the possibility that, is some
27   circumstances, the enforcement of most favored nations clauses can have severe anticompetitive

28   ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

340.

Disney challenges whether the base term and MFN clause unreasonably restrain trade. MTD at 14–18.  Relying on the Ninth Circuit opinion in *Brantley*, Disney contends that allegations of reduced consumer choice and preventing SLPTV providers from offering cheaper "skinny bundles" without the ESPN Network are insufficient to allege an injury to competition. MTD at 14–15 (citing *Brantley*, 675 F.3d 1192).

The facts of *Brantley* are not dissimilar to this action.  In *Brantley*, consumers of television programming brought an antitrust suit against several owners of television channels that are distributed through cable, as well as several owners of cable distributors, alleging that defendants conspired to restrain trade in violation of § 1.  *See Brantley v. NBC Universal, Inc.*, No. 07-CV-6101CASVBKX, 2009 WL 10671189 (C.D. Cal. Oct. 15, 2009).  The television "Programmer Defendants", such as NBC Universal, owned television channels sold to cable distributors such as Time Warner.[9]  *Brantley*, 675 F.3d at 1195.  The Programmer Defendants and cable distributors entered into vertical agreements with "bundling arrangements" which required distributors to purchase and sell all NBC Universal's channels as a multi-channel package, rather than permitting distributors from selling each channel separately.  *Id.* at 1195–96.  Plaintiffs alleged that the "Programmers' practice of selling packaged cable channels foreclosed independent programmers from entering and competing in the upstream market for programming channels."  *Id.* at 1196. The district court concluded that plaintiffs had adequately alleged injury to competition.  *Id.* However, plaintiffs later amended the complaint to delete the allegation that the programmer Defendants' practices with the distributors foreclose independent programmers from participating in the upstream market, leaving only allegations of reduced consumer choice and increased prices. *Id.* The district court subsequently dismissed plaintiffs' complaint for failure to allege a cognizable

effects.").

---

[9] The Programmer Defendants included NBC Universal, Inc., Viacom, Inc., The Walt Disney Company, Fox Entertainment Group, Inc., and Turner Broadcasting Systems, Inc.  *Brantley v. NBC Universal, Inc.*, 2009 WL 10671189, at *1 n.1.

United States District Court
Northern District of California

1    injury.  *Id.*

2          The Court agrees with Disney that, to the extent Plaintiffs rely on allegations of reduced

3    consumer choice and increased subscription prices, these allegations are insufficient to allege an

4    injury to competition.  *Brantley*, 675 F.3d at 1202.  Indeed, the Ninth Circuit concluded that

5    "because Section 1 does not proscribe all contracts that limit the freedom of the contracting

6    parties, a statement that parties have entered into a contract that limits some freedom of action (in

7    this case, by circumscribing the distributors' ability to offer smaller packages or channels on an

8    unbundled basis) is not sufficient to allege an injury to competition."  *Id.*  The fact that the base

9    term and MFN clause harms consumers does not state a cognizable injury to competition.

10          In *Brantley*, plaintiffs' allegations consisted of two separate tying arrangements: a tying

11   arrangement in the upstream market where NBC Universal requires each cable distributor to who

12   wishes to purchase its high demand channels must also purchase its low demand channels; and a

13   second tying arrangement in the downstream market where distributors sell consumers cable

14   channels only in packages consisting of the NBC Universal's entire offering of channels.  *Id.* at

15   1200–01.  While tying arrangements do not, on their own, threaten injury to competition, the

16   Ninth Circuit enumerated multiple types of injuries the plaintiffs could allege, including that: (1)

17   the seller's practice excludes other sellers from the market; (2) the seller's practice raises barriers

18   to entry; and (3) the tying arrangement facilitates horizontal collusion.  *Id.* at 1201.

19          Here, unlike in *Brantley*, Plaintiffs also allege that, in addition to increased prices, the

20   infrastructure and agreements have produced barriers to entry.  CAC ¶ 290.  Detailed allegations

21   of barriers to entry are sufficient to allege anticompetitive harm.  *Cf. Orchard Supply Hardware*

22   *LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1358 (N.D. Cal. 2013) (finding generic

23   allegations insufficient to plead a viable injury to competition, noting, *inter alia*, that there were

24   no allegations that the agreement facilitated horizontal collusion or foreclosed competitors from

25   entering into or competing in a market.).  For example, Plaintiffs describe a Carriage and

26   Streaming Infrastructure Barrier to Entry ("CSIBE") which requires expensive servers with

27

28   ORDER GRANTING IN PART & DEN. IN PART MOT. TO DISMISS; TERMINATING AS
     MOOT MOT. TO STAY DISCOVERY

United States District Court
Northern District of California

1    significant computing power that are capable of processing high resolution video and with

2    minimal latency and sufficient bandwidth to deliver video content over the internet.  *Id.* ¶¶ 291–

3    93.  The CAC alleges that "[t]o credibly enter the SLPTV market, a company must traverse the

4    CSIBE not only by obtaining computing power, distributed computing systems, large amounts of

5    data storage, and local data servers, but also by developing custom file systems and software

6    infrastructure to optimize streams."  *Id.* ¶ 296.  Companies such as YouTube had existing

7    streaming video structure that enabled it to quickly enter the SLPTV market at scale.  *Id.* ¶ 297.

8    Without pre-existing streaming infrastructure, new entrants will have to acquire the necessary

9    computing power and at storage to meet the baseline criteria to compete across the U.S. (*i.e.*, low

10   latency, high resolution, and robust streaming).  *Id.* ¶ 298.  Plaintiffs allege that this infrastructure

11   is cost-prohibitive to build from scratch.  *Id.* ¶ 299.  Indeed, Disney was able to quickly enter the

12   SLPTV market because it uses Amazon Web Services for its streaming services, Hulu's pre-

13   existing streaming infrastructure.  *Id.* ¶ 300.

14        Moreover, Plaintiffs allege that successful entry into the SLPTV market also requires

15   entering into multiple carriage agreements with cable providers to secure a "critical mass" of

16   television channels.  *Id.* ¶ 302.  Securing these agreements are slow and costly.  *Id.*  Not only must

17   market entrants negotiate with large cable providers such as Disney and NBC Universal, new

18   entrants also must secure local television channels, which are controlled "by a confusing, difficult-

19   to-navigate web of companies, with complicated (and occasionally divided) carriage and/or

20   transmission rights that must be acquired."  *Id.* ¶ 303.  Failure to secure enough channels "renders

21   a platform inviable as an SLPTV platform."  *Id.*

22        In sum, in addition to alleging reduced consumer choice and increased prices, Plaintiffs

23   allege that Disney's anticompetitive conduct has strengthened the CSIBE to prevent entry by

24   potential rival because a new entrant would need to contract with Disney in order to obtain

25   "several notable channels," such as ESPN, that are on every SLPTV platform.  *Id.* ¶ 304.  "Disney

26   thus maintains a cost input into each market participant's product, and can prevent or retard entry

27

United States District Court
Northern District of California

by mandating onerous terms or by outright refusing to license live television content." *Id.* ¶ 306.

Taken as true, these allegations are sufficient at the pleading stage to state an injury to competition in violation of Sherman Act § 1.

### B.      Claims for Damages

Finally, Disney argues Plaintiffs are barred from seeking damages by *Illinois Brick* because they are indirect purchasers.  MTD at 19.  In *Illinois Brick*, the Supreme Court held that "Indirect purchasers—i.e., individuals purchasing a product from at a point in the supply chain removed from the antitrust violation—generally have no standing under Section 4 of the Clayton Act."  *Brantley*, 2008 WL 11338585, at *5 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29 (1977)).  There is an exception to this rule for co-conspirators.  *See State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984).

According to Plaintiffs, Disney mischaracterizes Plaintiffs as indirect purchasers rather than as "direct purchasers of SLPTV subscriptions from DirecTV Stream" as pled.  Opp'n to MTD at 25.  Because Plaintiffs allege that Disney conspired with DirecTV Stream, its "fiercest competitor", Plaintiffs contend that the co-conspirator exception applies.  *Id.* (citing CAC ¶¶ 154–66, 177–96, 216–22, 304–27, 356–64).  The Court disagrees.  The co-conspirator exception applies only to conspiracies among horizontal competitors to fix prices.  *See State of Ariz.*, 729 F.2d at 1211.  Because the Court has determined that Plaintiffs fail to allege a horizontal agreement between competitors to restrain trade, this exception is not available to Plaintiffs.  *See supra* Section III.A.1.  Pursuant to *Illinois Brick*, indirect purchasers in a chain of distribution cannot sue for damages "based on unlawful overcharges passed onto them by intermediaries in the distribution chain who purchased directly from the alleged antitrust violator."  *Id.* at 1211–12.

Accordingly, Plaintiffs cannot maintain their claim for damages.

### C.      Leave to Amend

Plaintiffs request leave to amend any pleading deficiencies.  "Requests for leave to amend should be granted with 'extreme liberality.'"  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567,

United States District Court
Northern District of California

1  574 (9th Cir. 2020).  A court should not grant leave to amend if "it determines that the pleading

2  could not possibly be cured by allegation of other facts."  *Cook, Perkiss and Liehe, Inc. v. N. Cal.*

3  *Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).  The Court cannot say that Plaintiffs are

4  unable to allege facts establishing the existence of Sherman Act § 1 *per se* violation at this time.

5  Therefore, Plaintiffs' request is GRANTED.

6  **IV.    CONCLUSION**

7         For the foregoing reasons, Defendant's motion to dismiss for failure to state a claim is

8  GRANTED IN PART and DENIED IN PART with leave to amend.  The Court DENIES Disney's

9  motion to dismiss Plaintiffs' claim that Disney violated the Sherman Act § 1 under the rule of

10 reason and GRANTS Disney's motion to dismiss Plaintiffs' claim that Disney *per se* violated the

11 Sherman Act § 1 and for damages.  Should Plaintiffs choose to file an amended complaint, they

12 must do so by **October 16, 2023**.  Plaintiffs may not add new claims or parties without leave of

13 the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

14         In light of the Court's ruling on the motion to dismiss, Defendant's motion to stay

15 discovery pending resolution of the motion to dismiss at ECF No. 43 is TERMINATED AS

16 MOOT.

17         **IT IS SO ORDERED.**

18 Dated: September 29, 2023

19

20

21                                          EDWARD J. DAVILA
                                            United States District Judge
22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*